George HAMILTON et al., Plaintiffs,

v.

Monroe LOVE et al., Defendants.

No. LR–70–C–201.

United States District Court,
E. D. Arkansas, W. D.

June 2, 1971.

Steve Herman, Legal Aid Bureau of Pulaski County, Philip E. Kaplan, Walker, Kaplan, Lavey & Mays, Little Rock, Ark., Jack Greenberg and Stanley A. Bass, New York City, for plaintiffs.

Jim Guy Tucker, Pros. Atty., P. A. Hollingsworth, Deputy Pros. Atty., Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

EISELE, District Judge.

Five inmates of the Pulaski County, Arkansas, jail filed the complaint in this action, on their own behalf and on behalf of all others similarly situated, on September 30, 1970, naming Monroe Love, the Sheriff of Pulaski County, O. A. Allen, Superintendent of the Pulaski County jail, and Frank Mackey, the Pulaski County Judge, as defendants.

The plaintiffs seek a declaratory judgment, preliminary and permanent injunctions and "other appropriate relief" on the grounds that the conditions

of their incarceration constitute violations of their rights to both procedural and substantive due process and amount to cruel and unusual punishment.

Jurisdiction is invoked under 28 U.S.C. Section 1343(3) and 28 U.S.C. Section 2201. The suit is in equity pursuant to the provisions of 42 U.S.C. Section 1983. Plaintiffs allege deprivations, under color of state law, of rights, privileges and immunities, secured by the Eighth and Fourteenth Amendments to the Constitution of the United States.

■ With only insignificant exceptions, the Pulaski County jail is an institution used for the purpose of detaining persons who are awaiting trial. The inmates are either being detained because they cannot afford the fee for the bail bond set for them—the usual case—or because they have been accused of a capital or "non-bondable" offense. In all cases, such detainees are presumed innocent, in the eyes of the law, of the crime with which they have been charged. Their actual guilt or innocence remains for future determination.

The complaint alleges that the plaintiffs and the class they represent are being subjected to cruel and unusual punishment and are being denied the equal protection of the law because of certain practices and conditions—20 in number are listed—alleged to obtain at the jail. Illustrative of the charges are the following: all correspondence is censored; there is no ventilation and wholly inadequate bathing and toilet facilities; no provision for minimal medical and dental care; no recreational areas or programs; overcrowded, unsanitary and insecure cells; the presence of rats, roaches and poisonous insects; lack of protection against unprovoked assaults and homosexual attacks because of inadequacy of trained "free world" personnel; no classification system for the de-

tainees or rational separation thereof; absence of or inadequate bedding; and absence of laundry facilities. The plaintiffs contend that these conditions also constitute a denial of due process.

The plaintiffs complain that they are not informed or apprised of the standards of conduct expected of them or of the punishment or discipline which might follow from their departure from such standards.

Paragraph 13 of the complaint alleges, "There is a wholly inadequate staff to protect the physical well-being of prisoners".

The original complaint went into considerable detail in challenging the use of the isolation cell referred to as "the hole", but this problem has become moot during the course of the proceeding.[1]

Paragraph 18 of the complaint sums up the challenges made by the plaintiffs in this action, as follows:

"The actions of defendants have deprived members of the plaintiff class of rights, privileges and immunities secured to them by the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States, including, (a) the right to be free from cruel and unusual punishment, (b) the right to be free from arbitrary and capricious punishments, (c) the right to minimal due process safeguards in decisions determining fundamental liberties, (d) the right to be fed, housed, clothed, and receive medical treatment so as not to be subjected to loss of health or life, (f) the right to unhampered and uncensored access to counsel and the courts, (g) the right to be free from the abuses of fellow prisoners in all aspects of daily life, (h) the right to be free from racial segregation, (i) the right to minimal recreational op-

---

1. The first hearing was centered on the issues raised by defendants' use of the isolation cell. The Court indicated its disapproval of the practice and entered a temporary order forbidding the use of this facility for inmates under 20 years of age and federal prisoners. At the time scheduled for the first hearing on the merits the defendants voluntarily agreed to completely forego further use of the cell, and it has now been converted into a storage room.

portunities, (j) the right to even minimal standards of comfort, and sanitary facilities."

On October 16, 1970, the defendants filed a motion to dismiss on the ground that this was a suit, in essence, against the State of Arkansas and not maintainable in the federal courts. This motion to dismiss was overruled in open court at the commencement of the hearing upon the plaintiffs' motion for a temporary restraining order on October 22, 1970.[2] Thereafter, on October 30, 1970, the defendants filed their answer renewing their motion to dismiss and generally denying the allegations of the complaint. A hearing on the merits was first scheduled for January 20, 1971, and later rescheduled for February 24, 1971.

On February 22, 1971, both the plaintiffs and the defendants moved that the Court visit and inspect the Pulaski County jail. The motion was granted and the Court did visit, and make a thorough inspection of, the Pulaski County jail, prior to the hearing.

Early in the hearing, on February 24, 1971, the defendants filed a stipulation, the first paragraph of which reads as follows:

"Defendants stipulate and agree that the general conditions presently existent at the Pulaski County jail (hereinafter referred to as the "jail") taken as a whole do not meet minimum federal constitutional requirements with respect to prisoners' rights to due process of law and to be free from cruel and unusual punishment."

The stipulation then goes on to set forth past, present and future actions on the part of the defendants, and others, which were, and are, intended to bring the operation of the jail within minimum constitutional standards. Among other things, the stipulation pointed out that the defendant Frank Mackey, Pulaski County Judge, had submitted an application to the Department of Justice for planning funds for a new Pulaski County Community Correctional Facility; that the timetable for the completion of the new jail facility (assuming voter acceptance of the necessary bond issue) contemplates that occupancy would be possible early in 1974; that there is gross overcrowding in the jail; that extraordinary efforts would be undertaken to bring the detainees in the jail to trial as soon as possible, including the obtaining of an order from the state Supreme Court assigning additional trial judges for this purpose; that such efforts should result in a 50 per cent decrease in the population of the jail within nine months; that, pending the completion of the new correctional facility, efforts would be made to initiate recreational programs for detainees; that defendants would change their mail censorship policies so that, in the future, there would be no opening of mail from courts of record or attorneys of record and that length and quantity of outgoing and incoming correspondence would not be limited; that the defendants would promptly provide adequate laundry facilities for the washing of the prisoners' clothes; that reasonable use of the telephone would be permitted and that no attempt would be made to monitor telephone conversations; that reasonable improvements would be made in the extermination program to limit the presence of rodents, roaches and poisonous insects; that the defendants would provide the detainees with more adequate cleaning and bathing materials in order to keep their physical environment and bodies in a more hygienic state; that defendants would provide more adequate lighting for the cells and would undertake a study of the ventilation problems with a goal of significant improvement, as far as is reasonably possible, by the summer of 1971; that the defendants would institute a reasonable classification system and a scheme for separating prisoners; that the defendants would

2. See Board of Trustees of Arkansas A & M College v. Davis, 396 F.2d 730, 732–733 (8 Cir., 1968) and Holt v. Sarver, 442 F.2d 304 (8 Cir., 1971).

discontinue the use of the solitary confinement cell known as "the hole"; that defendants would agree to have a physician available at the jail for weekly sick calls not less than once per week, and that all incoming prisoners would receive a physical examination at the first sick call following their admission to jail; that defendants would agree to enlargement of visitation privileges; that the defendants would provide each incoming detainee with a printed copy of all rules and regulations regarding conduct and privileges; and, finally, that the defendants agree that a consent order incorporating the matters set forth in the stipulation could be entered by the court.

On February 24, 1971, after the hearing, the court entered an "interim order" which provided, inter alia, that the defendants "are authorized and directed to proceed forthwith to implement the agreement set out in the stipulation filed this date in open court"; that the attorneys for the parties would each submit to the Court a report on the actual operation of the jail under the stipulation; that the attorney for the defendants would "advise the Court as to the steps which would be required under state law (including any actions that may be required by the Quorum Court) to obtain funds for the employment of additional security personnel at the county jail, which would permit the assignment of at least one deputy to serve in the jail area on both the first and second floors of the jail on an around-the-clock, 24-hour-a-day basis;" that the parties "will keep the Court advised as to any actions taken in the legislative or judicial areas which might tend to assist in the amelioration of the problems revealed by the evidence, and particularly those actions which might have a tendency to reduce the population of the county jail to a number more in keeping with the design capacity of the jail"; and that the defendants would make a detailed report to the Court "with respect to actions taken to clean up the existing facilities in order to provide mini-

mum hygienic conditions". By its letter to the attorneys for the parties on the same date (February 24, 1971) the Court stated:

"The testimony makes it clear to the Court that the solution of many of the problems in this case depends upon the availability of additional personnel. Sheriff Love's testimony indicated the need for a security deputy on each floor of the jail. The Court is particularly concerned with the protection of the inmates from physical assault and physical abuse. It is concerned about prompt availability of medical services when the need arises. It is concerned about the continuous maintenance of minimum hygienic conditions. It is not clear how these problems can be adequately dealt with, absent at least a few additional personnel. For this reason, the enclosed order calls upon the prosecuting attorney to make known to the Court the practical and legal requirements which would have to be met to accomplish this goal."

On March 30, 1971, the plaintiffs applied to the Court for a new hearing in order "to ascertain the exact status of all items required by the order and stipulation. * * *"

On April 2, 1971, the plaintiffs filed their report on the operation of the Pulaski County jail under the Court's order of February 24, 1971. While acknowledging many improvements made by the defendants and other actions taken by the defendants in compliance with the Court's order, they noted or alleged, among other things, that no new employees had been hired to serve on the jail staff; that the defendants had not implemented a recreational or exercise program; that incoming mail was still being read by the jailors and that the length and content of outgoing mail was being restricted; that no laundry facility had been made available to the inmates who, as a consequence, still had to wash their own clothes in the small lavatory sinks found in the cells; that no apparent steps had been taken toward

improving the ventilation of the cells; that the detainees were still not being provided with adequate cleaning and bathing materials; that no classification system had been devised or implemented; that the "bullpens" remained segregated; that the medical examinations and services promised had not been forthcoming; and that no rules and regulations covering detainee conduct had been drawn up.

On April 7, 1971, the defendants filed their "Status Report on Interim Order, Paragraph 3". This report sets forth in detail the improvements made, takes issue with certain items in the plaintiffs' report, and admits that certain efforts to comply with the order had not succeeded or had been modified or delayed in their implementation. The defendants' report of April 7, 1971, states that, by April 8, 1971, the fourth floor of the jail (which had been used for the storage of supplies and was an open area which had never been used for jail purposes) would be completely cleared and therefore available for implementation of recreational programs; that daily newspapers were made available to the detainees; that detainees were permitted to have radios if they were equipped with earphones; that the jail personnel had been "emphatically instructed" not to open any mail from a court or counsel of record or to read any mail from relatives and friends which had been opened and searched for contraband; that all restrictions as to the length and quantity of correspondence had been removed; that pens, pencils and paper were being made available on the commissary wagons to all inmates, free of charge; that the defendants were "presently and steadfastly attempting to make appropriate provision for the washing of inmates clothes"; that phone calls were not monitored and that all prisoners had reasonable access to the telephone; that effective and regular rodent and insect extermination measures had been imple-

mented; that firefighting equipment was maintained in compliance with city fire laws; that each prisoner was supplied with soap for personal hygiene and would, "in the immediate future", be provided with towels; that all prisoners would have access to scouring utensils and disinfectants for the cleaning of the toilets and sinks in the cells; that new light fixtures had been installed and that "improvement of ventilation facilities is presently under advisement"; that all prisoners on sick call have been attended with due promptness and that the jail physician "has agreed to examine all incoming prisoners at the first sick call following their admission to the jail"; and that printed copies of all rules and regulations regarding conduct and privileges would be available by April 16, 1971. The defendants' report also stated that the use of "the hole" had been discontinued and the solitary confinement cell converted into a storage room.

Paragraph 13 of the report states:

"Defendants have, as of yet, been unable to devise a feasible scheme for separation of prisoners. However, the bullpens have been integrated and thereafter again segregated upon request of black prisoners."[3]

On April 7, 1971, the defendants also filed a "Status Report on Interim Order, Paragraph 4", which stated that an "estimated minimum expenditure" of $2,100.00 per month would be necessary to provide at least one deputy to serve in the jail area of the first and second floors on a 24-hour-a-day basis. This report also advised the Court that the defendants were in contact with representatives of the Federal Bureau of Prisons, and that an expert from the prisons had conducted a study of the personnel problems and would submit a report of his findings and conclusions.

As soon as the Court was notified that the representative of the Bureau of

---

3. The continuation of racial segregation may violate the equal protection clause of the Fourteenth Amendment. See Holt v. Sarver, 309 F.Supp. 362 (E.D.Ark., 1970). A report on progress will also be required with respect to this problem.

Prisons had completed his study, a hearing was scheduled for May 4, 1971, for the principal purpose of obtaining expert opinion upon the minimum staffing requirements which would be necessary if the present antiquated jail facility were to be operated within minimum constitutional requirements.

Before discussing the results of this last hearing, it is important to describe the conditions existing at the Pulaski County jail, both in terms of facilities and personnel, as revealed to the Court by its personal inspection thereof and by the evidence introduced by the parties at the various hearings.

The Pulaski County jail was built in the late 1920's. It is a four-story, gray concrete and steel building, almost cubical in shape, originally constructed on a site some 200 yards from its present location. It was moved to the new site approximately 15 years ago, in order to clear the way for the construction of LaHarpe Boulevard, which is adjacent to, and parallels, the Arkansas River in the downtown Little Rock area. The jail is located between this boulevard and the river, just west of a sand and gravel company operation, and practically under, and just east of, highway ramps which enter into a bridge crossing the Arkansas River to the north. The great majority of the inmates of this institution are housed on two floors. On the third floor is a cell which is usually referred to as the "juvenile" cell, in which approximately 10 of the younger inmates were housed as of the date of the first hearing. This very small cell has an estimated floor area of 175 square feet. The rest of the third floor and all of the fourth floor are open areas which have never been used for direct jail purposes.

The inmate housing facilities consist of three cell blocks for males, a dormitory for females and several outside cells, the latter for occupancy by adult and juvenile males. To be more specific, there are 11 cells numbered one through 11, as follows: cells 1, 2, 3 and 4 are on the first floor, cells 1 and 2 having six bunks, cell 3 having 15, and cell 4 having 12; on the second floor are cells 5, 6, 7, 8 and 9, with cell 5 holding six, number 6 holding four, number 7 holding four, number 8 "bullpen" holding 30, and number 9 "bullpen" holding 32; cell number 10 is located in the basement and is used as a "holding cell", where jailors may put inmates who are brought in during the night hours. Cell 10 has five beds in it. Cell 11, on the third floor, is the "juvenile cell", with 10 beds in it. These occupancy figures were those obtaining at the date of the first hearing, when there were in excess of 125 inmates in the Pulaski County jail.

The number of inmates in this institution has increased steadily over the years. Prior to the initiation of this litigation, the population had gone as high as 134, but averaged, in recent years, between 125 and 130. As of the date of the last hearing, the population had been reduced to slightly less than 100. Captain Allen observed in his testimony that some years ago those operating the jail thought they were crowded if they had as many as 75 inmates.

Entrance to the jail is gained through an electrically controlled gate at the top of a flight of concrete stairs. After entering, this first gate is closed and a second electrically controlled gate then opens. After passing through the second gate, one finds himself in the small "lobby" area, with the control room to his left and a small office to his right. Immediately behind the control room is a room with a table and chairs which is used for visitation purposes and for conferences between the inmates and their attorneys. Further to the left one finds the elevator shaft and stairwell.

The building and equipment have deteriorated greatly over the years. Much of the original equipment is no longer operative. Apparently this is true with respect to the original ventilation system. The very elaborate cell locking mechanisms, particularly those used in

the "bullpen" areas on the second floor, are presently inoperative. Most of the toilets are of the old niche, recessed type. The plumbing is bad and requires constant attention. The washing and showering facilities are completely inadequate. There are no safety vestibules and some windows have detention screens and some solid metal covers.

When the Court first inspected the jail, at the request of the parties, it came away with the impression that the cell areas were dark, dirty, very unsanitary, poorly ventilated, overcrowded, smelly and, overall, unhealthy and depressing places.

At the time this action was commenced, the jail had no recreational, exercise, vocational or educational programs of any kind. No community resources were being utilized.

The time spent by the detainees in this institution varies considerably, but the average is approximately four months. Many have stayed in excess of one year, and some for several years while awaiting trial.

The average inmate spends most of his time sitting or lying upon his bunk. Indeed, inactivity, in miserable surroundings, was the principal feature of the detainees' existence as the situation existed when this proceeding was initiated.

There are some 14 paid members on the county jail staff, including two female cooks. The latter have no jailor or supervisory duties. Captain Allen is in charge. All of the other employees work a 40-hour week and are paid $400.00 a month, or less. The employees are also furnished duty meals, which are considered a part of their salaries. All of the employees are selected by the sheriff. The work is divided, principally, into three shifts. Captain Allen works many hours every day, not confining himself to merely one shift. Mrs. Allen is the only matron. She works the 7 a. m. to 3 p. m. shift on Mondays through Fridays. Mr. Sewell, who is approximately 80 years old, works the same shift in the capacity of control room operator, clerk and bookkeeper. Two additional jailors work the morning shift and a Mr. Aaron works a split shift from 8:30 a. m. to 4:30 p. m. Mr. Ballentine, Mr. Fred Ward and Mr. Henry Beck, on varying days, man the 3 p. m. to 11 p. m. shift. Mr. Johnson, Mr. Rogers and Mr. Cash staff the 11 p. m. to 7 a. m. shift.

Because of holidays and the 40-hour work week, only two jailors are usually present on the second or third shifts, and the testimony indicated that there are extended periods when there is only one paid "free world" employee on duty in the entire facility. Since it is essential that one person remain in the control room, this means, that during these shifts, there may be only one, or no, jailor available to patrol the inmate living quarters.

It should be remembered that there are no single or double occupancy cells in this facility. Ordinarily there are four or more inmates in each cell and, of course, in the large "bullpen" areas, 30 or more are housed together. Each of these "bullpen" areas is divided into five compartments, four with bunks, the fifth being a larger "day room". When the old locking system operated, it was possible to separate the inmates and lock them in the four living compartments. Now, however, all prisoners in each of the two "bullpen" areas are free to move about at will through the four small cell areas and the larger day room.

During the course of these proceedings the Court has heard evidence of vicious assaults, homosexual attacks, torture and inadequate and untimely medical aid in emergency conditions. Taking the limitations imposed by the inadequate and antiquated physical facilities, the only answer to these problems must depend on the employment and utilization of additional trained "free world" personnel. The testimony before the Court clearly indicates that unless there is a jailor in the immediate area where the inmates are housed at all times, there will be no possibility of controlling this situation.

The Court, while emphasizing those deficiencies in the present jail operation which most directly affect the lives and physical and mental health of the inmates, does not thereby intend to indicate that there are not other conditions in the operation of this jail facility which may fall below minimum constitutional standards. The Court is simply attempting to take first things first. Furthermore, as indicated in the discussion below, there have been good faith attempts by the defendants to deal with many of the problems within their control. In some instances, it is too early to determine whether their efforts will be adequate. Therefore, the Court is withholding judgment with respect to such matters, while doing all in its power to encourage prompt, voluntary action.

For instance, the Court is convinced from the testimony that the ventilation system at the jail is entirely inadequate during the summer months. For security and related purposes, large sheets of plate metal have been bolted over the bars, in some of the windows, completely shutting out natural ventilation. The testimony indicates that when the outside temperature gets into the 90s and above, the crowded cells become like "ovens". This condition is, of course, a hazard to the health of the inmates. The testimony indicates that there might be some disagreement among the defendants, or between them and other officials, as to the remedy. It is natural that no one wants to "throw good money after bad" or to make extensive improvements to a facility that all agree should be condemned. Still it is absolutely clear to the Court that this is a problem that the defendants must deal with because, assuming optimum progress, it appears from the evidence that inmates will be housed in this institution for at least the next three years. The detainees in the Pulaski County jail are entitled to the vindication of their constitutional rights now. It is equally clear that substantial sums of money will have to be spent upon this facility if it is to meet minimal standards during the "interim" period before the County obtains the use of a new facility. Furthermore, at this stage there is absolutely no certainty that the County will ever have a new jail facility.

This Court can only deal with present realities.

Captain Allen indicated in his testimony that he was of the opinion that the cell areas could be air-cooled by an expenditure of as little as $3,000.00. Others are of the opinion that the cost would be much higher. As pointed out above, the County has committed itself to deal with this problem. Time, however, is slipping by and the summer is practically here. The Court in its order, therefore, will require a prompt report on progress made toward the solution of this problem.

The inmates of the Pulaski County jail ordinarily wear the clothing which they have on their backs when they enter that institution for the entire period of their stay. There is no prison garb. There is no laundry. The inmates must wash their own clothes in their cell lavatory or shower facilities, and it is obvious that many do not bother. This circumstance contributes to the unhealthy and unsanitary conditions. The defendants are exploring the possibility of obtaining prison garb and laundry service. Improvement in this area should also dramatically improve morale and clearly would improve the living quarters themselves since, under present conditions, articles of clothing are hung at various places around the cell areas and contribute substantially to the dank, dreary and depressing effect mentioned above. Here again, no action is indicated pending some report on the results of the voluntary efforts now being made by the defendants.

■ The plaintiffs seek to make this a class action pursuant to Rule 23 of the Federal Civil Procedure. The Court has concluded that the plaintiffs have met

the requirements of the law in this respect and that the action should proceed with the named plaintiffs representing themselves and a class composed of all persons detained in the Pulaski County jail facility from time to time during the pendency of this action, who are awaiting trial.

The constitutional limitations upon the conditions of pre-trial detention are not as clear as they should be. Since the courts of this country are being forced to deal with such problems more frequently now than ever before, we can expect clearer pronouncements and guidelines from our higher courts over the next few years. Some propositions, however, would seem beyond doubt on the basis of present precedent and the clear language of our constitution.

■ The inmates of the Pulaski County jail should not be referred to as "convicts" or even "prisoners", considering the usual connotations of such terms. Furthermore, it is not really appropriate to judge the constitutionality of the conditions of their incarceration by referring to the "cruel and unusual punishment" provisions of the Eighth Amendment. Having been convicted of no crime, the detainees should not have to suffer *any* "punishment", as such, whether "cruel and unusual" or not.

As pointed out above, most of the inmates of the Pulaski County jail are there because they do not have the financial resources to pay bondsmen the necessary money to obtain their release. The testimony revealed that there are in excess of 1,300 persons awaiting trial in the state courts of Pulaski County. Some 90 per cent are free and walking the streets of this and other communities. Many of these, who are free upon bond, have criminal records considerably worse than some of those who are presently in the Pulaski County jail. Nevertheless, they are free because they had something else: money.

■ It is a fundamental constitutional tenet that those similarly classified must be similarly treated, and that the system of classification itself must bear a rational relationship to legitimate state purposes. Under the equal protection clause, it would not seem possible to be able to classify detainees, awaiting trial, in the same group with those persons who have been convicted of crime and sentenced to prison. And, yet, that appears to be what we have been doing as a practical matter, not only locally, but across the nation. Ironically the lot of those detained while awaiting trial appears to be worse than that of those convicted and serving their sentences in the usual penitentiary systems. Indeed there was clear testimony before this court by inmates presently incarcerated at our Arkansas state penitentiaries, who had also previously been incarcerated in the Pulaski County jail, that the conditions in the former institutions were definitely preferable to those obtaining in the Pulaski County jail. They indicated that practically anything was better than "rotting" in a jail cell. In the penitentiaries they have the opportunity of getting out into the fields to work and also the opportunity to engage in sports and other recreational activities, which privileges are denied detainees in the county jail.

■ It is clear that the conditions for pre-trial detention must not only be equal to, but superior to, those permitted for prisoners serving sentences for the crimes they have committed against society.

■ The only legitimate state purpose served by holding in jail those who are unable to make bond is to make certain that those detained are present when their cases are finally called for trial. It is simply a means of guaranteeing the appearance of the detainee. *After* trial and conviction, the incarceration of those sentenced to prison may serve other legitimate state purposes, the most obvious of which is punishment itself.

■ The only factor which would legitimately permit a difference in the treatment of those who are free on bond, while awaiting trial, from those who are detained in jails, while awaiting trial, is the assumed risk of non-appearance of the latter. The distinction between those detained and those on bail must be based upon the State's determination that there is a need for physical custody of the former. This distinction is implicitly recognized in our Constitution when it provides that, "excessive bail shall not be required * * *." U.S. Const. Amend. VIII. Accepting this distinction as constitutionally permissible, then it is manifestly obvious that the conditions of incarceration for detainees must, cumulatively, add up to the least restrictive means of achieving the purpose requiring and justifying the deprivation of liberty. As pointed out in Butler v. Crumlish, 229 F.Supp. 565 (E. D.Pa.1964):

> "The constitutional authority for the State to distinguish between criminal defendants by freeing those who supply bail pending trial and confining those who do not, furnishes no justification for any additional inequality of treatment beyond that which is inherent in the confinement itself." (P. 567).

Judge Freedman in the *Crumlish* case went on to make the following important point:

> "Nor may a court disregard the practical effects of its judgment and ignore the common knowledge that the system of bail, based as it is on financial ability, is weighted heavily against the poor. * * * The theoretical equality of the right to bail when all are not financially equal thus has become in reality a deep and wounding social inequality, increasingly oppressive to the poor and the vagrant. It brings to mind Anatole France's ironic epigram that the law in its majestic impartiality forbids the rich and poor alike to sleep under bridges." (Pp. 567–568).

In an excellent article in The Yale Law Journal, vol. 79, pp. 741–760 (1970) on "Constitutional Limitations on the Conditions of Pretrial Detention", it is pointed out:

> "Once the proper classification is established, the action of the state toward the group must be evaluated to ensure that it is reasonably related to the legitimate governmental end. A line of cases holds that where a person has not been convicted of a crime, any deprivation of his liberty by the state must be the least restrictive means of achieving the purpose of the deprivation. Civil commitment, sequestration, and medical quarantine are examples of such deprivations." (P. 949).

The notewriter cites Covington v. Harris, 136 U.S.App.D.C. 35, 419 F.2d 617 (1969) as enunciating certain due process considerations as follows:

> "The principle of the least restrictive alternative consistent with the legitimate purposes of a commitment inheres in the very nature of civil commitment, which entails an extraordinary deprivation of liberty. * * * A statute sanctioning such a drastic curtailment of the rights of citizens must be narrowly, even grudgingly, construed in order to avoid deprivation without due process of law." (Covington, pp. 623–624).

The Yale Law Journal notewriter makes the interesting point that such constitutional limitations might, in fact, make it improper for jail authorities to require detainees to participate in rehabilitation programs against their will, even though such mandatory programs would be entirely appropriate for convicted criminals as an aspect of their imprisonment or even "punishment", if you will. Conversely, it is noted that the overly strict and unreasonable controls on the physical movement of detain-

ees and lack of the necessary space for exercise and other normal physical activities might render detention under such circumstances constitutionally inadequate.

Here the defendants have cleared out the open areas on the fourth floor of the jail which, the Court finds, could be readily adapted for exercise and recreational programs. The defendants, however, have indicated that, with inadequate staff, they are concerned with the security problems incident to the movement of the prisoners, in small groups or otherwise, from the cells to the fourth floor recreation area and the return of such prisoners from the fourth floor to their cells. In view of the testimony of Mr. Wingfield of the Bureau of Prisons with respect to staff requirements and the decision of the Court, set forth below, on the personnel needed to meet constitutional requirements, the Court assumes that the defendants, upon compliance, will have the necessary personnel to move into an exercise and recreational program utilizing the open spaces on either the fourth or the third floor of the jail. It therefore further assumes that any unreasonable restrictions upon the physical movement and physical activity of the inmates will be removed as soon as the necessary trained personnel are on hand.

■ The Court has already pointed out that there can be no justification for "punishment" of detainees whether "cruel or unusual" under the Eighth Amendment, or not. If the conditions of detainment are such that they can *only* be considered punitive, or as punishment, then, of course, the subjecting of such detainees to such conditions would violate the due process requirements of the Fifth and Fourteenth Amendments, as well as the quoted provision of the Eighth Amendment. Manifestly, therefore, if the conditions of pre-trial detention derive from punishment rationales, such as retribution, deterrence, or even involuntary rehabilitation, then those conditions are suspect

constitutionally and must fall unless also clearly justified by the limited stated purpose and objective of pre-trial detention discussed above. It is, of course, true that any deprivation of liberty, incarceration, or physical detention is, in reality, a form of punishment. Nevertheless, its use may still be justified if it meets the "least restrictive alternative" test described above.

The author of the *Yale* article, supra, in discussing the arguments and attitudes of jail officials in general, has practically summarized the testimony heard by the Court from the defendants here.

"Courts passing on detainees' suits will have the delicate job of weighing the detainees' valid claims against serious objections raised by jail administrators. All these objections can be traced to the one problem of insufficient resources; administrators will claim that they do the best they can with what they have, but given their resources, the restrictions they impose are necessary, in light of security and administrative needs, to hold detainees until trial. A very small percentage of determined troublemakers can disrupt the whole jail routine; the lack of professional staff to administer classification procedures and the difficulty of assessing an individual's attitude in a short period of time mean that maximum security is required for everyone to preclude the possibility of trouble. It is arguable that preserving custody of detainees with the present level of resources (1) necessitates all differences in treatment between them and bailees, (2) cannot be done by any less restrictive means, and (3) serves the purpose of ensuring the defendants' appearance at trial. In view of these considerations, the administrators' actions seem less excessive." (P. 955).

His analysis of such arguments is also helpful:

"In one sense, the argument is substantial; providing a normal civilian

life for detainees would mean providing so many facilities, services and personnel that it would create an intolerable burden on the resources of the state. In another sense, however, the argument is preposterous; maintaining secure custody requires only a large, controllable space, not censorship of mail or confinement in a tiny, locked cell. Not only are resources misspent on unnecessary restrictions like censorship; even if all resources were spent properly, they might be inadequate. If the level of resources is always taken as given, it can justify anything—even depriving detainees to the point of starving them, were the level lower." (P. 955).

Inadequate resources can never be an adequate justification for the state's depriving any person of his constitutional rights. If the state cannot obtain the resources to detain persons awaiting trial in accordance with minimum constitutional standards, then the state simply will not be permitted to detain such persons. The final decision may, indeed, rest with the qualified voters of the governmental unit involved. This Court, of course, cannot require the voters to make available the resources needed by public officials to meet constitutional standards, but it can and must require the release of persons held under conditions which violate their constitutional rights, at least where the correction of such conditions is not brought about within a reasonable time.

The most serious and patent defects in the present operation result directly from inadequate staffing. When this became obvious from testimony given in earlier hearings, the Court scheduled the May 4 hearing, referred to above, to obtain expert guidance. Mr. Ray Wingfield of the Federal Correctional Institution, located in Texarkana, Texas, an expert penologist qualified by years of experience, had theretofore made a study of the Pulaski County jail at the request of the defendants. The Court called him as a witness to obtain his opinion on minimum staffing needs. At the hearing, it was pointed out to the parties and to Mr. Ray Wingfield that the Court was not here concerned with ideal conditions, or even with "good" operating conditions. Rather, it wanted to hear the opinion of a professional penologist as to the number and qualifications of paid personnel which would be needed to reasonably assure that the lives and health of the detainees would be protected during the period of their detainment. The Court made it clear that, minimally, a detainee ought to have the reasonable expectation that he would survive his period of detainment with his life; that he would not be assaulted, abused or molested during his detainment; and that his physical and mental health would be reasonably protected during this period.

Mr. Wingfield prepared three exhibits for the purpose of making his testimony and recommendations clear to the Court and the parties. Exhibit A[4] is the staffing plan which Mr. Wingfield, as a professional, would recommend if the jail were to be operated in accordance with modern penological standards. Exhibit B is the staffing plan which Mr. Wingfield recommended would be needed to operate the Pulaski County jail facility at full capacity in accordance with minimum constitutional standards as those standards were explained to him by the Court. Both plans A and B assume a prison population of approximately 100. Exhibit C is the staffing plan which, in Mr. Wingfield's opinion would meet such minimum constitutional requirements if the population of the facility were reduced to 75 or under. Here Mr. Wingfield assumed that the 75 would consist of approximately 65 males and 10 females.

---

4. Mr. Wingfield's plans cover only personnel charged with "jail" or supervisory responsibilities. Therefore the cooks are not included.

Mr. Wingfield recommended that the maximum capacity of the various cells [5] be reduced as follows:

|  |  | From | To |
|---|---|---|---|
| First floor, | cell 1 | 6 | 4 |
|  | cell 2 | 6 | 4 |
|  | cell 3 | 12 | 12 |
|  | cell 4 | 12 | 10 |
|  |  | From | To |
| Second floor, | cell 5 | 6 | 6 |
|  | cell 6 | 4 | 4 |
|  | cell 7 | 4 | 4 |
|  | cell 8 | 30 | 20 |
|  | cell 9 | 32 | 20 |
| Third floor, | cell 11 | 8 | 6 |
| Basement, | cell 10 | 10 | 10 |

■ Considering the testimony and the Court's own observations of the facilities at a time when some 125–130 persons were incarcerated therein, the Court is convinced that Mr. Wingfield's recommendations as to cell capacities are not unreasonable. However, the Court wishes to give the defendants an ample margin in order that they might be in a position to deal with emergency situations. It is convinced, however, that adequate constitutional standards cannot be met, absent changes in the physical facilities, and regardless of the number and qualifications of staff, if the prison population is permitted to exceed 115 at any one time. And, of course, as pointed out below, the population will be further limited in the Court's order by the performance of the defendants in providing necessary paid personnel. To implement this part of its order, the Court will require the defendants to file a report with the Court, so long as this action is pending, on any day in which the population exceeds 115, which report will specify the number of inmates in residence and explain the reasons therefor and indicate the date that the defendants expect the population to again return below the 115 figure. Hopefully the defendants and the prosecuting authorities will strive to keep the population far below the maximum permitted.

Exhibit A, the staff plan which would permit the operation of the facility in accordance with modern penological standards, calls for 16 positions which would, in fact, require 22 employees. That plan would have called for one captain, one lieutenant, three sergeant-jailors, seven jailors, five control room clerks, four matrons and one matron-nurse.

Exhibit B, which contains Mr. Wingfield's opinion as to the minimum number of positions to operate the facility in accordance with constitutional standards at recommended capacity, calls for 14 positions requiring 20 personnel, as follows: one captain, four sergeant-jailors, six jailors, four matrons, and five control room clerks.

Exhibit C sets forth the staffing requirements to meet minimum constitutional needs on the assumption that the population of the facility were to be reduced below 75 and that all male detainees were kept on one floor. This plan calls for 11 positions requiring 16 personnel, as follows: one captain, four sergeant-jailors, two jailors, four matrons, and five control room clerks. (Under this plan there would be one eight-hour shift during each week without any matron on duty.)

The various plans assume a certain number of days off, holidays, annual leave, and sick leave in accordance with standard practices, assumedly those in the federal government.

The problem with respect to the female inmates is difficult because they constitute a relatively small proportion of the prison population. At present there is only one full-time matron, Mrs. Allen, and she works an eight-hour shift, five days a week. This means that on two days out of each week there are no female paid personnel in the facility. On the other five days there is no female member of the staff in the fa-

---

5. The number of places for trusties, who would also be utilized under Mr. Wingfield's various plans, would be reduced from 20 to 14. The trusties have, of course, no weapons and do not perform jailor or security functions and would operate only under the direction of paid "free world" personnel.

cility for 16 out of the 24 hours. This, of course, is intolerable. Not only does this situation result in an insufferable indignity to the women detainees, but it is also a condition which potentially constitutes a hazard to health.

■ Plan A submitted by Mr. Wingfield calls for five women employees, and plans B and C each require four. Although a minimum of four women are required to give substantially 24-hour-a-day supervision of the women prisoners, it is obvious that the same number of women personnel could supervise a much larger number of women. The housing of such a small number of women detainees at the Pulaski County jail therefore results in a disproportionate requirement for female staff members. If a common jail facility for female detainees, separate and apart from the Pulaski County jail, were available which could serve the needs of not only Pulaski County but many other of the counties in the states, it would obviously be possible to have a more economical and efficient utilization of female staff. However, it is not for the Court to decide where the female detainees shall be housed. It is only essential for the Court to determine if the conditions under which they are housed in the Pulaski County jail meet minimum constitutional standards. The Court concludes that it is necessary that at least one female "free world" staff member be on duty 24 hours a day. This is especially true since it appears that female prisoners are occasionally housed on both the first and second floors of the jail.

The problem with respect to the juveniles will apparently become moot in the very near future since the defendants have advised the Court that they have committed themselves to cease utilizing this facility for juveniles in the near future.

■ Mr. Wingfield's testimony convinces the Court that the proper performance of their duties by jail personnel results in what can only be properly called "hard work". Eight-hour shifts, therefore, are the maximum recommended for efficient performance.

■ The Court is not an expert on personnel matters. The objective of the Court, and the objective of Mr. Wingfield, as set forth in Exhibits B and C, is to make it possible to have one paid "free world" staff member on each "cell" floor patrolling in the immediate area of every person detained in any of the cells in the Pulaski County jail on a 24-hour-a-day basis. Absent this, there is no practical way to protect the lives and safety of the detainees. Whether the defendants can obtain this degree of supervision utilizing fewer personnel the Court does not know. It is clear that they cannot do so by only utilizing presently available personnel.

The Court wants the assistance of the attorneys for the parties in formulating a decree in accordance with this opinion. It is particularly concerned about the time scheduled for compliance with the requirement to add additional personnel or to reduce the jail population. The Court is tentatively of the opinion that the defendants should be in full compliance not later than September 1, 1971, and that some interim schedule of acceptable progress towards this goal be established. Over the near term, it is also clear that the defendants should be required to add at least two additional paid personnel (which would bring the staff to a total of 14) on or before June 30, 1971. Of course, if it were possible to reduce the population to 75 or below, then a further addition of two would meet the requirements as set forth in Mr. Wingfield's Exhibit C. This would bring the staff to a total of 16.

The guidelines having been established in this decision, the Court requests the attorneys for the plaintiffs to submit a proposed decree on or before June 7, 1971, setting forth their judgment as to time schedule for full implementation thereof. The defendants will respond thereto and may submit any alternate proposals on or before June 10.

Issues not specifically dealt with and resolved herein are reserved.