Vickie CUDNIK et al., Plaintiffs,

v.

Ralph KREIGER et al., Defendants.

No. C74–275.

United States District Court,
N. D. Ohio, E. D.

July 16, 1974.

Douglas L. Rogers, Legal Aid Society of Cleveland, Cleveland, Ohio, for plaintiffs.

John T. Corrigan, Pros. Atty. for Cuyahoga County, George Sadd, Richard A. Goulder, Thomas P. Gill, Asst. County Prosecutors, for defendants.

## MEMORANDUM OPINION AND ORDER

BATTISTI, Chief Judge.

Plaintiffs bring this action for injunctive and declaratory relief under 42 U. S.C. § 1983. They seek to redress the deprivation of constitutional rights allegedly suffered by the actions of the following governmental officials: Ralph Kreiger, the sheriff of Cuyahoga County; Edward Payne, the deputy in charge of jail operations; and Dr. Stacey A. Besst, the physician at the county jail. Jurisdiction is predicated on 28 U.S.C. §§ 1343(3), (4) and 2201, 2202.

After the issuance of a temporary restraining order,[1] an evidentiary hearing was held on plaintiffs' motion for a preliminary injunction. The parties then briefed the issues joined at the hearing. Upon counsels' representation that no additional testimony would be adduced, the Court now proceeds to a final disposition on the merits.

## I.

The named plaintiff and two intervenors bring this action on behalf of a class of individuals consisting "of all pretrial detainees presently confined at the jail, and all pretrial detainees who will be confined at the jail in the future, who before being incarcerated were receiving methadone as treatment for a drug addiction problem, such methadone having been prescribed by a duly licensed physician from a drug program regulated and supported by the state and federal governments."[2] The plaintiffs challenge the admitted jail policy which denies them methadone during pretrial confinement.

Plaintiff Cudnik was addicted to heroin for approximately five years prior to her acceptance in 1971 as a patient at the Cleveland Treatment Center of the Ohio Bureau of Drug Abuse (hereinafter "BUDA"). Pursuant to the course of treatment prescribed by BUDA physicians, this plaintiff now receives a daily dosage of methadone, a drug very similar to heroin in chemical formulation. Her participation in a drug treatment program prior to arrest and detention, a requirement contained in the class definition, is a material factor in the disposition of this lawsuit. Therefore, an examination of such programs is instructive.

Ohio drug treatment programs, such as BUDA, are subject to the regulation and approval of both the Food and Drug Administration of the Department of Health, Education and Welfare and the

---

1. The order issued April 3, 1974, was continued in effect by consent of the parties until final disposition.

2. During the pendency of the action, Miss Cudnik posted the requisite bond for release.

Ohio Department of Mental Health and Mental Retardation. *See generally,* 21 C.F.R. § 310.505[3] and Ohio Rev.Code §§ 5122.51 and .52. To gain approval, a methadone treatment program must provide a range of services including medical treatment for addiction, counseling, vocational and educational guidance, and employment placement. 21 C.F.R. § 310.505(b)(1)(i) and (ii). BUDA, in particular, provides such services for an average of 431 patients per month.

Before gaining admittance to a program, the prospective patient must give voluntary consent to treatment, undergo a thorough physical examination, and demonstrate a physiologic addiction to a narcotic drug. The regulatory standards used to determine addiction are set forth in 21 C.F.R. § 310.505(d)(3)(ii) and include the observation of early withdrawal symptoms during initial drug abstinance, a urine test showing the presence of narcotics and various physical manifestations.

After the patient's admittance, the physician determines the drug treatment, if any, which is to be administered. Dr. Carl Ostermeyer, the present medical director at BUDA, stated that in a case of very mild addiction methadone is not necessarily prescribed. In such instances a patient is given counseling and guidance. Dr. Ostermeyer has also had occasion to provide a placebo for his patients who demonstate only a psychological need to take drugs.

When a patient suffers from a substantial addiction, methadone is substituted for the drug previously used. As explained by Dr. Joel Steinberg, a psychiatrist and past medical director of BUDA,[4] a daily dosage of methadone holds the physical aspect of addiction in check. This, in turn, gives the patient an opportunity to overcome the psychological and social causes of addiction before attempting to achieve a drug free state. By definition, "maintenance treatment" is the controlled daily use of methadone in conjunction with guidance and counseling. 21 C.F.R. § 310.-505(a)(3). This regulation also acknowledges that while "an eventual drug free state is the treatment goal . . . it is recognized that for some patients the drug may be needed for long periods of time."

To achieve a drug free state, Dr. Steinberg and Dr. Ostermeyer prefer to detoxify their patients. The regulations define "detoxification treatment" as the "dispensing of methadone . . . in decreasing doses to reach a drug free state in a period not to exceed 21 days . . . ." 21 C.F.R. § 310.505(a)(2). It is their medical opinion that withdrawal symptoms can be avoided by the gradual step-down in drug dosage.

Plaintiffs seek to represent a class of pretrial detainees all of who undergo the above-described medical treatment as patients in a methadone treatment program. Succinctly stated, the facts giving rise to the dispute at bar are as follows: Miss Cudnik was arrested on drug violation charges lodged against her two years previous to her arrest. Being unable to post bail, she informed jail officials of her drug addiction and participation in a treatment program. Plaintiff asked that she be permitted to receive methadone to prevent the onslaught of withdrawal. Her request was denied. She was told that the jail policy set by Sheriff Kreiger prohibited the dispensing of narcotic drugs. When Miss Cudnik began to experience withdrawal, Dr. Besst began a course of treatment designed to alleviate some of her more severe physical symptoms.

All of the expert medical witnesses agree that methadone withdrawal is less intense, but lengthier than heroin withdrawal. They further agree that during withdrawal without benefit of medical treatment, i. e., "cold turkey," a methadone addict will experience severe pain, aching bones and joints, stomach cramps, diarrhea, vomiting, twitching

3. All citations to the Code of Federal Regulations reflect the March, 1974, recodification. See 39 Fed.Reg. 11680–11712 (1974).

4. Dr. Steinberg is also a White House Consultant on drug abuse.

muscles, running eyes and nose, and various levels of anxiety. It is also agreed that Dr. Besst's treatment modality, consisting of approximately 25 mg. of librium, 5 mg. of chloral hydrate, one capsule of Darvon Compound 65, and one tablet containing phenobarbital and belladonna, is a medically accepted course of treatment for withdrawal symptoms.

Dr. Besst informed the Court that he administers the above treatment twice a day for approximately ten days depending upon the individual's needs. The medical opinion offered by the defense is that the physical symptoms not alleviated by Dr. Besst's "withdrawal kit" are no worse than "a bad case of the flu." But, Dr. Ostermeyer and Dr. Steinberg assert that Dr. Besst's mode of treatment does not provide effective relief, especially when compared to the almost complete absence of physical discomfort associated with methadone detoxification. Miss Cudnik testified and the Court so finds that throughout her two-day treatment by Dr. Besst she suffered severe and debilitating symptoms of withdrawal.

A physician must be licensed to administer methadone. 21 C.F.R. § 310.-505(c)(1); 21 U.S.C. § 802(20). Dr. Besst is not licensed, nor is he in complete agreement with the use of this drug in the treatment of addiction. But since the sheriff, who is charged with policy making, is opposed to the use of methadone at the county jail, Dr. Besst has no medical choice of treatment. He can only offer his "withdrawal kit" to afford some measure of relief to withdrawing addicts. Dr. Besst is also of the opinion that jail confinement provides an excellent opportunity to *require* an addict to withdraw. When asked whether the State ought to force withdrawal on a pretrial detainee, he replied: "Whereas they may not be guilty of the charge that they are there for, they have admitted guilt to addiction . . . and I think that they should have withdrawal and rehabilitation enforced upon them as a matter of the State's obligation."

In contrast, Dr. Ostermeyer and Dr. Steinberg offer their medical judgment that a pretrial detainee on a maintenance program should be permitted to receive a daily dosage of methadone if the period of confinement will only be a matter of a few days. However, it is their opinion that if a patient is to be confined for longer periods of time, the controlled environment of the jail would prompt them to detoxify the patient with methadone.

This in essence provides the scenario for the clash of medical opinion with respect to the treatment of methadone addicts in pretrial detention. The legal thrust, however, does not permit a resolution of this difference of opinion. Rather, the issue to be decided is whether, as a matter of due process, a pretrial detainee who is undergoing a specific treatment for drug addiction prior to detention has the right to the continuation of that treatment uninterrupted by officials at the detention facility.

## II.

The defendants argue that the doctrine of abstention should preclude the Court's entertaining this cause of action. "Abstention is a judicially created doctrine that emerged in Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1940). In that case the Supreme Court held that a federal court in certain narrowly defined 'special circumstances' should abstain from exercising equity jurisdiction to enjoin the operation of a state statute." Gay v. Board of Registration Commissioners, 466 F.2d 879, 883 (6th Cir. 1972). The doctrine is predicated on the existence of an uncertainty in state law which might be authoritatively construed in the state courts; such a construction could thereby obviate the necessity of deciding a federal constitutional claim. Harman v. Forssenius, 380 U.S. 528, 534, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965). *See also* Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); Wisconsin v. Constantineau, 400 U.S. 433,

438, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). Since, as demonstrated below, there is no uncertainty of state law involved, the Court declines to "stay its hand."

Prior to the institution of plaintiffs' action, the county common pleas court had before it a consolidated suit, Hannus v. Kreiger, Case No. 919,225 (1973), which presented a similar challenge to the jail methadone policy. These actions were foreclosed, however, when the state court of appeals issued a writ of prohibition directing the trial judge to dismiss the suits. Ohio ex rel. Kreiger v. Marshall, Case No. 33394 (1974). The short opinion accompanying the writ simply provided: "Writ allowed. See Sections 341.06 and 341.09 O.R.C., and Section 2917.17, O.R.C. Exc."

Section 341.06 of the Ohio Revised Code provides in pertinent part:

"The court of common pleas shall prescribe rules for the regulation and government of the county jail upon the following subjects:

\*     \*     \*     \*     \*     \*

(f) The employment of medical or surgical aid, when necessary . . . ."

Section 341.09 deals with the separation of prisoners at the jail and directs the judges of the common pleas court to enforce the statutory section through regulations. The last citation given by the court of appeals, section 2917.17, was repealed some three months prior to that court's decision. In sum, section 2917.17 prohibited the conveying of narcotic drugs into a jail, except in accordance with jail rules and regulations.

Sections 341.06 and .09 are not challenged by the action at bar. Nor are they ambiguous. Basically, the statutory scheme places regulatory authority over conditions at the county jail within the domain of the judges of the common pleas court. The regulations presently in force, of which the Court takes judicial notice, do not prohibit or condone medical treatment with narcotic drugs

at the jail. Thus, no court regulation of uncertain scope is material to this suit.

What is being challenged is an operational rule imposed by the sheriff in his capacity as overseer of the jail. Ohio Rev.Code § 341.01 is the source of the sheriff's duties at the jail. He is charged with the responsibility of operating the jail in accordance with court regulations.

"The sheriff shall . . . govern and *regulate* the jail according to the rules and regulations prescribed by the court . . . ." (Emphasis supplied.) O.R.C. § 341.01.

■■ Plaintiffs claim that the sheriff's operational rule which prohibits them from obtaining methadone during pretrial detention impinges on their constitutional right to due process. It is true that federal courts must be mindful to avoid unnecessary interference with state functions or regulatory schemes. Lake Carriers Assoc. v. MacMullan, 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972); Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). "Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities. But a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution. When a prisoner regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights. Johnson v. Avery, 393 U.S. 483, 486 [89 S.Ct. 747, 21 L.Ed.2d 718] (1969)." Procunier v. Martinez, *supra*, 416 U.S. 396, 94 S.Ct. 1800, 1807, 40 L. Ed.2d 224 (1974). Finally, the "mere possibility" that a state court will vindicate constitutional rights in another lawsuit is no ground for a federal court to abstain. *Id.* at 4608, Wisconsin v. Constantineau, *supra*, 400 U.S. at 439, 91 S. Ct. 507, 27 L.Ed.2d 515 (1971); Zwickler v. Koota, 389 U.S. 241, 251, 88 S.Ct.

391, 19 L.Ed.2d 444 (1967); Jones v. Metzger, 456 F.2d 854, 856 (6th Cir. 1972).

### III.

█ The named plaintiff and intervenors seek to represent a class of persons who, now and in the future, are (will be) receiving medical treatment in an approved methadone program prior to their pretrial detention at the jail. See class definition, *supra*, at 306. It is apparent that common questions of fact and law pertain to the constitutional scrutiny of the sheriff's policy.

Testimony received at the hearing indicates that at any given time approximately 35 methadone addicts are in the jail. These statistics, given by Dr. Besst, reflect the general jail population which averages 450 inmates and includes convicted prisoners as well as pretrial detainees. While the numerosity of the class of pretrial detainees cannot be easily determined, the fact that a constant turnover of individuals occurs as detainees are able to post bail, or are actually tried, weighs heavily in favor of permitting the suit to proceed as a class action. Jones v. Wittenberg, 323 F.Supp. 93, 99 (N.D.Ohio 1971), aff'd sub nom Jones v. Metzger, *supra*, 456 F.2d 854 (6th Cir. 1972). *See also* Johnson v. Lark, 365 F.Supp. 289, 292 (E.D.Mo.1973); Inmates of Suffolk County Jail v. Eisenstadt, 360 F.Supp. 676 (D.Mass.1973); Baker v. Hamilton, 345 F.Supp. 345, 350 (W.D. Ky.1972); Collins v. Schoonfield, 344 F.Supp. 257, 263 (D.Md.1972); Hamilton v. Love, 328 F.Supp. 1182, 1190–91 (E.D.Ark.1971). *But see* Inmates of Milwaukee County Jail v. Petersen, 51 F.R.D. 540 (E.D.Wisc.1971).

The requirements of Rule 23(a), including adequacy of representation, have been met. The class is certified under Rule 23(b)(2) as the defendants have been shown to engage in actions directed against the class as a whole and the suit is for injunctive and declaratory relief.

### IV.

Cases brought by convicted prisoners raising claims of lack of adequate medical care have received wide attention in the federal courts. The Eighth Amendment's proscription of cruel and unusual punishment has been the constitutional standard employed in deciding such claims, and it is only where prison authorities have displayed a callous and deliberate disregard of the medical needs of inmates that such claims have been held to be actionable. *See e. g.*, Martinez v. Mancusi, 443 F.2d 921 (2d Cir. 1970), cert. denied, 401 U.S. 983, 91 S. Ct. 1202, 28 L.Ed.2d 335 (1971).

In keeping with the above rationale, the defendants argue that the plaintiffs are not entitled to receive methadone at the jail. The reasons asserted essentially are: (1) that Dr. Besst offers a medically accepted treatment for withdrawal, (2) that the jail treatment does not evidence a disregard for the health of addicted inmates, and (3) that a choice between methadone and the jail "withdrawal kit" would entail a prohibited "second-guessing . . . [of] the adequacy of medical care that the state provides." Fitzke v. Shappell, 468 F.2d 1072, 1076 (6th Cir. 1972). This reasoning, while true for convicted prisoners, is in this instance misdirected.

█ The distinction between convicted prisoners and pretrial detainees bears greatly on the assessment of the constitutionality of the conditions of incarceration. Here, the class which plaintiffs represent consists only of pretrial detainees who are, as a fundamental constitutional tenent, presumed innocent of any wrongdoing. In re Winship, 397 U.S. 358, 363, 90 S.Ct. 1068, 25 L. Ed.2d 368 (1970). The Eighth Amendment standards which prohibit cruel and unusual treatment of prisoners has doubtful applicability to pretrial detainees, for the state may subject an individual to punishment only after conviction of a crime. Johnson v. Glick, 481 F.2d 1028, 1032 (2d Cir. 1973); Rhem v. Malcolm, 371 F.Supp. 594, 623–24 (S.

D.N.Y.1974); Hamilton v. Love, *supra*, 328 F.Supp. at 1191. Since an unconvicted individual may not be punished by the state, it follows that a proper analytical framework for the assessment of conditions of pretrial detention is the due process clause.[5] Jones v. Wittenberg, *supra*, 323 F.Supp. at 100, aff'd sub nom Jones v. Metzger, *supra*, 456 F.2d at 855; Fitzke v. Shappell, *supra*, 468 F.2d at 1076. *See also* Rhem v. Malcolm, *supra*, 371 F.Supp. at 623; Inmates of Suffolk County Jail v. Eisenstadt, 360 F.Supp. 676, 686, 688 (D. Mass.1973); Brenneman v. Madigan, 343 F.Supp. 128, 137 (N.D.Cal.1972); Hamilton v. Love, *supra*, 328 F.Supp. at 1193.

■ Certainly, a person who is detained for trial suffers a form of "punishment," the loss of liberty. But the state derives its authority to exact this deprivation from the constitutional implication that reasonable bail is a proper condition to an individual's liberty pending trial.[6] However, a pretrial detainee, innocent in the eyes of the law, retains all the rights and liberties that his bailed counterpart enjoys, except those necessarily lost through the fact of confinement. Inmates of Milwaukee County Jail v. Petersen, 353 F.Supp. 1157, 1160 (E.D.Wisc.1973); Collins v. Schoonfield, *supra*, 344 F.Supp. at 265. *Cf.* Coffin v. Reichard, 143 F.2d 443, 445 (6th Cir. 1944).

■ Given this permissible deprivation of liberty, due process and its concept of fundamental fairness dictate that a pretrial detainee should not be subjected to additional punishment or loss, unless such further deprivation receives justification from a valid interest of the state. Included in the ban of punishment without due process is

forced and involuntary rehabilitation which in this instance the defendant jail officials seek to impose on plaintiffs. As aptly stated in Hamilton v. Love, *supra*, 328 F.Supp. at 1193:

"If the conditions of pre-trial detention derive from punishment rationales, such as retribution, deterrence, or even involuntary rehabilitation, then those conditions are suspect constitutionally and must fall unless also clearly justified by the limited . . . purpose and objective of pre-trial detention . . . ."

*See also* Rhem v. Malcolm, *supra*, 371 F. Supp. at 622, 623; Inmates of Suffolk County Jail v. Eisenstadt, *supra*, 360 F. Supp. at 686; Conklin v. Hancock, 334 F.Supp. 1119, 1121 (D.N.H.1971); Seale v. Manson, 326 F.Supp. 1375, 1379 (D. Conn.1971).

Recent cases have held that pretrial confinement must be consistent with the least restrictive means available to achieve this valid governmental objective. Brenneman v. Madigan, *supra*, 343 F.Supp. at 138, citing Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed. 2d 231 (1960). In Hamilton v. Love, *supra*, 328 F.Supp. at 1192, the court held:

"It is manifestly obvious that the conditions of incarceration for detainees must, cumulatively, add up to the least restrictive means of achieving the purpose requiring and justifying the deprivation of liberty."

*See also* Rhem v. Malcolm, *supra*, 371 F. Supp. at 622; Inmates of Suffolk County Jail v. Eisenstadt, *supra*, 360 F.Supp. at 686; Smith v. Sampson, 349 F.Supp. 268, 271 (D.N.H.1972); Collins v. Schoonfield, *supra*, 344 F.Supp. at 265.

■ ■ The state's sole interest in detaining an individual prior to trial is to assure that person's appearance at

---

5. When appropriate circumstances pertained, other courts employed the equal protection clause to gauge the constitutionality of pretrial confinement. Brenneman v. Madigan, 343 F.Supp. 128, 138 (N.D.Cal.1972), there as an alternative to the due process holding, the conditions of confinement for pretrial detainees were compared to the conditions

pertaining to convicted prisoners. *See also* Jones v. Wittenberg, 323 F.Supp. 93, 100 (N.D.Ohio 1971).

6. The Eighth Amendment provides in pertinent part: "Excessive bail shall not be required . . . ."

trial. A corollary to this is the state's interest in the security and internal order of its jails. Rhem v. Malcolm, *supra,* 371 F.Supp. at 623; Inmates of Suffolk County Jail v. Eisenstadt, *supra,* 360 F.Supp. at 685, 686; Smith v. Sampson, *supra,* 349 F.Supp. at 271, 272; Brenneman v. Madigan, *supra,* 343 F.Supp. at 137; Hamilton v. Love, *supra,* 328 F.Supp. at 1191. If the jail policy, here involved, furthers neither of the above interests and plaintiffs are shown to suffer a deprivation of liberty enjoyed by methadone addicts able to post bail, they are entitled to relief.

Factually, plaintiffs have been found to suffer severe pain and discomfort when their methadone is discontinued at the jail. The suffering has been shown to continue even though Dr. Besst makes a good faith medical attempt to alleviate the severe withdrawal symptoms. Plaintiffs' loss is substantial, whether it be deemed a liberty or property interest. The deprivation is not suffered by bailed methadone addicts who are able to continue to receive specialized treatment for drug addiction.

Significantly, Dr. Besst's method of treatment leaves the withdrawing addict "incapacitated" for an estimated period of ten days, a time when effective assistance of counsel could well be crucial. If plaintiffs were permitted to be maintained or detoxified on methadone during their pretrial confinement, they would not undergo any serious and incapacitating symptoms.

On balance, the jail prohibition of methadone has no relation to the primary state interest of securing the presence of an individual for trial. Nor is the secondary interest in jail security advanced by this policy. The testimony at the hearing revealed that one supposed threat to security would be the possibility that other inmates would also want drugs. If in fact a disruption occurred, detainees receiving methadone could be separately classified and isolated. The county jail already has separate facilities for both men and women, popularly referred to as the "drug range." [7] To deny methadone on this ground, where other means are available to insure jail security, would not be consistent with the least restrictive means of confinement.

Other alleged security problems advanced by the defendants include an illicit jail market for methadone and the possibility of theft of the drug. These problems are at best highly remote. Granting plaintiffs their requested relief would not necessitate storing methadone at the jail. Plaintiffs ask only that their physicians, or other treatment facility staff, be permitted to bring methadone to them daily. A jail market for the drug is also unlikely. Methadone can be and is administered in liquid form by BUDA personnel. The liquid must also be consumed in the presence of the person administering the drug.

As additional evidence of the lack of a security risk, plaintiffs have shown that BUDA staff members have administered methadone at other jails in the metropolitan area. Moreover, the prospect of an influx of medical personnel frequenting the jail should not create a security risk. Such persons would be subject to screening and observation as are attorneys and legal assistants who periodically visit the jail. Dr. Besst has also stated that he has on occasion permitted physicians to visit patient inmates of the jail.

The jail policy of denying methadone to pretrial detainees, who were receiving treatment at a methadone program prior to incarceration, is in essence a state sanctioned measure of involuntary rehabilitation. It is fostered by governmen-

---

7. Each "range" contains a day room with abutting cell blocks. The facility for males has 20 cells, each of which measures 5 feet by 8 feet. They are equipped with a wash basin and toilet; fresh towels, sheets, and a mattress are also provided.

tal officials and constitutes state action under section 1983. The policy does not effectuate the state's narrow interests in pretrial confinement and causes a deprivation that is not suffered by bailed methadone addicts. The policy thus constitutes punishment imposed without a finding of criminal culpability and, as such, is violative of fundamental due process rights.

## V.

Upon consideration of the foregoing findings of fact and conclusions of law,

It is ordered that defendants Ralph Kreiger, Dr. S. A. Besst, Edward Payne, and each of them individually and in their official capacities, their successors, agents, servants, and employees are permanently enjoined from preventing pretrial detainees of the Cuyahoga County Jail, who immediately prior to their detention were participating in an approved methadone treatment program, from receiving methadone administered as treatment for drug addiction by and within the medical discretion of the physicians of such methadone treatment programs or any designated agent of said physicians.

It is further ordered that the defendants, their successors, agents, servants, and employees shall permit the above methadone treatment to be rendered at an appropriate and secure area of the jail, or, alternatively and within the discretion of the sheriff, such treatment shall be rendered at the premises of the methadone treatment facility where an individual member of the class is a patient; and each detainee, during the administration of such treatment, shall be permitted to converse with this treating physician or the latter's designated agent for purposes of treatment.

It is further ordered that the defendants, their successors, agents, servants, and employees expressly inform all pretrial detainees who immediately prior to confinement were receiving treatment at a methadone program of their opportunity to continue to receive such treatment during their pretrial confinement.

It is so ordered.