365 F.Supp. 289 (1973)
Harold Count JOHNSON, and all other plaintiffs, as per list, namely Russell Peden, et al., Plaintiffs,
v.
Al LARK, Individually and as Warden of the St. Louis City Jail, et al., Defendants.
No. 71 C 114(3).
United States District Court, E. D. Missouri, E. D.
July 13, 1973.
*290 *291 Phillip F. Fishman and Walter Heiser, Legal Aid Society, St. Louis, Mo., for plaintiffs.
Jack L. Koehr, City Counselor and John J. FitzGibbon, Associate City Counselor, St. Louis, Mo., for defendants Al Lark and City of St. Louis.
Richard O. Funsch, Carter, Bull, Baer, Presberg & Lee, St. Louis, Mo., for Dr. Jones.

MEMORANDUM OPINION AND ORDER
WEBSTER, District Judge.
Plaintiff Harold Count Johnson brought this civil rights action as a class action to redress alleged infringements of his constitutional rights and the rights of other members of the class while federal prisoners detained in the St. Louis City Jail, and to obtain declaratory and injunctive relief. Plaintiff bases Count I of the complaint upon 42 U.S.C. §§ 1983 and 1988 and 28 U.S. C. § 2201. Jurisdiction is founded upon 28 U.S.C. § 1343(3) and (4), and 28 U. S.C. § 1331.
In Count II, plaintiff asserts a class claim for damages against defendant City of St. Louis as third party beneficiaries under a contract between the City of St. Louis and the United States Bureau of Prisons for occasional custody of federal prisoners, alleging that such contract had been breached by defendant City of St. Louis to the damage of the defendant and the class. The claim is founded upon a federal statute, 18 U.S. C. § 4002, and jurisdiction is asserted under 28 U.S.C. § 1343(3) and (4); and 28 U.S.C. § 1331.[1]

The Parties
Defendant Al Lark was at all times material to this action warden of the St. Louis City Jail and is sued in his individual *292 and official capacity. Defendant Augustine Jones, M.D., was, at the time of the filing of the action, the physician for the city jail and was so engaged during the period of January 9, 1971 to and including May 4, 1971. The City of St. Louis, originally named as a party defendant in Count I, was dismissed as to that count by court order dated August 4, 1972, on motion of plaintiff.

The Class
Plaintiff brought this action on behalf of all federal prisoners in the city jail. Immediately prior to trial, the court found that the class was so numerous that the joinder of all members was impractical; that there were questions of law and fact common to the class; that the conditions of which plaintiff complained were typical of the claims of the class, and that plaintiff would fairly and adequately protect the interests of the class.[2] Rule 23(a), Federal Rules of Civil Procedure. The court further found that defendants were alleged to have acted or refused to have acted on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole. Fed.R.Civ.P. 23(b)(2).
With respect to the class, however, the court limited the class, insofar as the complaint sought declaratory and injunctive relief, to all federal prisoners who were in the city jail during the period January 9, 1971 to and including May 4, 1971,[3] and all present and future federal prisoners in the city jail.

I

Civil Rights Contentions
In Count I, plaintiff Johnson complains of conditions in the city jail and treatment to which he was subjected while a federal prisoner confined there awaiting trial on a federal charge. He claims that the following conditions, individually and collectively, constituted cruel and unusual punishment and, as to some, a denial of due process of law:
(a) overcrowding, sanitation and living conditions
(b) discipline and procedures for solitary confinement
(c) rules for mail and visitation
(d) inadequate medical care
(e) food
(f) striking of prisoner
(g) failure to return personal property
Plaintiff further contends that these conditions, which will be more particularly described infra, deprived him of the equal protection of the laws in that these conditions were worse than conditions to which most federal prisoners are subjected.
Plaintiff further contends that by denying him access to law books and reasonable visits by counsel, he was deprived of effective assistance of counsel in violation of his Sixth and Fourteenth Amendment Rights.
Plaintiff alleges that his treatment resulted in severe rash and headaches, for which he seeks actual damages of $5,000. On behalf of the class he seeks declaratory and injunctive relief intended to correct and forbid the conditions claimed to be violative of the constitutional rights of the class.

Conditions at City Jail
Plaintiff and defendant have stipulated with respect to certain conditions prevailing during the period January 9, 1971 through May 4, 1971.
In the course of the trial, the court heard testimony of federal prisoners who were inmates during the period at issue, January-May, 1971. The court *293 also heard expert testimony from physicians and penologists who inspected the city jail on behalf of plaintiff. Both defendants testified with respect to jail conditions. In addition, defendants offered the testimony of jail administrators and newly added personnel and consultants with respect to changes which have occurred in jail conditions since the institution of this action.
The court is mindful of the fact that the members of the class are limited to federal prisoners whose presence in the city jail was the result of a contract between the City of St. Louis and the Bureau of Prisons. It, therefore, does not seem appropriate, and this court declines to use this civil rights action as a vehicle to make a searching inquiry into all aspects of the operation of the jail. Burns v. Swenson, 430 F.2d 771, 775 (8th Cir. 1970); see Sostre v. McGinnis, 442 F.2d 178, 183-185 (2d Cir. 1971).
For example, it is not necessary, in order to determine this case, for the court to make detailed findings with respect to what medical supplies, equipment and personnel are appropriate for the operation of a jail under the most enlightened conditions. Rather, the court will consider whether the facilities available to the class were so inadequate as to constitute, separately or in conjunction with other inadequacies, a deprivation of constitutionally protected rights.
We turn first to conditions as they were at the time plaintiff Johnson was a federal prisoner in the city jail pursuant to a contract for service between the City of St. Louis and the U.S. Bureau of Prisons,[4] and then to conditions as subsequently modified.

a) Overcrowding, Sanitation and Living Conditions
The St. Louis City Jail was built in 1914. It was designed to hold a capacity of 384 male prisoners and 48 female prisoners, or a total of 432. It is a maximum security facility. Floors 2 through 4 of the St. Louis City Jail have cells designed to hold 2 inmates each, and floor 5 has cells designed to hold 8 inmates each. During the period January 9, 1971 through May 4, 1971, all of the 156 cells in the jail were in use. At that time, there were approximately 542 inmates being held in the St. Louis Jail, a figure 110 in excess of the designed inmate capacity. Chief Deputy U.S. Marshal Duane Caldwell testified that during the period January-May, 1971, 412 federal prisoners spent time in city jail.[5]
During the January-May, 1971 period, the federal prisoners were held in two-man cells on the second floor of the jail during their confinement. The two-man cells are 8'2" long, 5'2" wide and 8'2" high. All of the two-man cells have one commode, one washstand and one drinking fountain. At time of trial, federal prisoners were being housed on the third and fourth floors, primarily in one tier.
The St. Louis City Jail provided no personal clothing (jail issue) for federal prisoners. The only laundry facilities available for washing prisoners' clothes were buckets, wash basins and soap. There was a pay laundry for inmates who wanted someone else to wash their personal clothing. Inmates wore normal street clothes in the jail.
St. Louis City Jail had a steam heating system employing radiators on each floor. Ventilation was accomplished by means of windows opening on to a central air shaft with a large ventilator fan on the seventh floor to exhaust air to the outside. There was no air conditioning system.
There were no games or sports involving physical contact carried on at the *294 city jail. Prisoners had access to television. They could purchase playing cards and checker sets at the commissary. No jail employee was designated to be in charge of any recreation that did exist. Inmates were never allowed out-of-doors for recreational purposes.
The city jail had a commissary for all inmates, including federal prisoners. Federal prisoners could buy candy and tobacco and other items not provided free by the jail. The office of the warden received the monies collected from the sale of items from the commissary during the period of plaintiff's confinement.
During the period of plaintiff's confinement at the city jail, there was no social worker, trained counselor or psychologist employed at the jail. On occasion, defendant Augustine Jones, Rev. Paul Bynes and defendant Warden Lark were available to see pre-trial detainees and federal prisoners at the city jail. Under the "Rules for Guidance of Inmates" an inmate could discuss a problem with a jail guard.
Regulations of the Bureau of Prisons for custody and treatment of federal prisoners in non-federal institutions provide that "federal prisoners will be held in clean quarters, adequately heated and ventilated and will receive adequate and wholesome food and proper medical attention."
Each of the prisoner witnesses who was a witness on behalf of plaintiff and the class testified that he was at various times confined in 4' × 8'[6] cells, designed for two persons, with three persons in the cell. In each such case, the third person was required to place his jail-issued mattress on the floor and sleep there. There was no evidence to the contrary. Witnesses testified that neither the mattress nor the mattress covers were cleaned prior to issuance, that blankets were stained and were reissued without washing or cleaning. Plaintiff testified that he slept on the floor, three in a cell, for one week; that the floor was damp from overflow of the commode, and that no disinfectant or soap was issued to the inmates in the cell. Following these conditions, the plaintiff developed a skin rash, which will be discussed infra in connection with medical treatment.
Witness Bass testified that sheets and towels are now laundered once a week and blankets are now washed instead of being fumigated. They are now washed when a prisoner leaves the jail and before being reissued to new arrivals. Bass also testified that he had recently purchased 1,000 towels to be used by jail inmates.
There were no educational or training programs available at the St. Louis Jail. The jail had no official library. Periodicals were brought in from charitable organizations and distributed among the various cell blocks.
For many years, recreation at the jail has been limited to watching television and playing cards in the gangway area outside the cells. Witness Bass testified that since the filing of this action, a program has been placed in effect, sponsored by the Division of Parks and Recreation, which provides one female and two male recreation leaders at the jail. Movies are now provided. Crafts are now available for female prisoners, and basketball, volleyball and ping pong may be played on a limited basis. Several additional radios have been ordered. Ventilation has been improved by the purchase of twenty additional industrial fans.
Re-awakened concern for the conditions of the inmates is also evidenced by other changes effected by Mr. Bass. Writing papers, stamps, toilet items and clothing, previously unavailable to the indigent, are now provided by the social workers staff on a need basis. Additional phones are being installed on each floor so that social workers may place calls on behalf of prisoners. Visiting *295 hours have been expanded to include Tuesday evenings from 6:30 p. m. to 8:30 p. m.

b) Discipline and Solitary Confinement

The St. Louis City Jail had "Rules for the Guidance of Inmates" in effect during January 9-May 4, 1971 and thereafter. These were the only written regulations governing guidance of inmates, including discipline, at that time. There were no specific lists of rule infractions and corresponding punishments.
Of the approximately 542 inmates incarcerated in the jail from January 9 through May 4, 1971, an average of 85% were pre-trial detainees. Pre-trial detainees were not treated differently than convicted federal prisoners in the city jail, but federal prisoners were confined in a separate section of the jail. Federal prisoners were not advised of any specific regulations pertaining to them regarding their detention.
During this period, defendant Lark's policy was to segregate prisoners according to age and seriousness of the alleged offense. There was no classification or segregation made or attempted on the basis of prior criminal experience, reported tendencies toward aggressiveness, emotional stability, presence of communicable diseases, sexual abnormalities, drug or alcohol addiction, or whether the inmate had been convicted or was being held in lieu of bond.
Inmates were advised of the existence of the "Rules for Guidance" by jail personnel and the possible consequences of violations. Violations could result in a prisoner, including a federal prisoner, being placed in solitary confinement for as long as fourteen days. A federal prisoner charged with violating a rule of conduct of the jail received no written notice of the charge. There was no formal notice or hearing or procedure of any kind prior to inmates' being placed in solitary confinement. No legal counsel or counsel of any kind was permitted to assist the inmate prior to his being placed in solitary confinement. There was no formal hearing board to determine or review who was to be placed in solitary confinement. Guards, as distinguished from guard officers, did not have authority to place inmates in solitary confinement.
The only records of such proceedings resulting in solitary confinement were contained in a log book which was maintained by the warden and which indicated the alleged violation of "Rules of Conduct" and the action taken thereon. Inmates, including federal prisoners, received no written decision stating the basis for the disciplinary action. Inmates who were subject to solitary confinement were not informed of the duration of their sentence. The length of time served in solitary confinement depended upon the severity of the alleged violation and the discretion of the guard officer.[7]
There were three solitary confinement cells in the St. Louis City Jail. Disciplinary cell # 1 was 12' 10" long by 11' 2" wide by 12' high. Disciplinary cell # 2 was 11' 3" long by 7' 3" wide by 12' high, and disciplinary cell # 3 was 16' 1" long by 7' 6" wide by 12' high. There were no bunks in these cells. Prisoners placed in solitary confinement received bread and water, and a noon meal. The inmates were not given clothing and bedding in 1971, but are now given a mattress, one sheet and one pillow. The inmates in solitary confinement were denied mail call and family visits, but were allowed to see their attorneys.
Prior to the bringing of this action, prisoners were subject to being placed in solitary confinement at the whim of the guard officer or other jail officials. Prisoners were taken summarily to the segregation area without any procedure for prior hearing by a responsible disciplinary captain for determination of *296 guilt or innocence and designation of punishment. No rules or statement of infractions which might result in segregation cell treatment were ever communicated to the prisoners.
Today, such decisions are made by a disciplinary committee, consisting of the warden, the training director and the corrections manager. Portions of the procedure are communicated to each inmate, and the procedure is posted on each tier. Segregation is authorized "for the purpose of insuring immediate control and supervision when it is determined that [prisoners] constitute a threat to themselves, to others or the safety and security of the jail. A willful refusal to obey an order or demonstrate a defiance of personnel acting in line of duty may constitute sufficient basis for placing a resident in segregation." In such circumstances, the social worker and/or penologist is directed to confer with the prisoner as soon as possible and no longer than twenty-four hours after such segregation. All persons charged with misconduct or violation of a rule or regulation of the jail are to be informed of the specific charges and will be given an opportunity to answer. Neither the reporting or investigating officer is to be a member of the disciplinary team. If segregation is ordered, the status of a prisoner who spends over ten continuous days is to be reviewed. No segregation is to be continued beyond thirty days without a psychiatric or psychological interview. Written findings of the disciplinary team are required.

c) Mail and Visitation Rights

There were no law statute books, legal text books or model legal forms available to the federal inmates at the jail in 1971. There were no typewriters available or paper issued to the federal prisoners. The statutes of Missouri are now available.
The defendant warden enforced provisions of the rules requiring prisoners to give the warden written authority to open and inspect their mail in accordance with the rules; this being done, an inmate was allowed to write one letter a day, either to members of his family, his attorney or any other person who was approved by the warden. All incoming mail, including packages, was checked for contraband and money.
Inmates, including federal inmates, were never permitted to place telephone calls themselves. However, on very special occasions, inmates could receive long-distance telephone calls. There were no telephones provided generally for use of federal prisoners.
Inmates, including federal prisoners, were allowed supervised visits from the members of a prisoner's immediate family, a minister or any other person approved by the warden. Visitation hours were Thursdays between the hours of 12:00 noon and 2:00 p. m. Inmates, including federal prisoners, were allowed to see their attorneys between 9:00 a. m. and 11:00 a. m. and between 2:00 p. m. and 4:00 p. m. daily, and between 9:00 a. m. and 11:00 a. m. on Saturdays. Mr. Bass testified that attorneys now have almost unrestricted visiting rights during a normal eight-hour period six days a week; that the inmate curfew hour has been extended two hours to 10:30 p. m. on weekdays and midnight on weekends. Two daily newspapers are now available on each tier  one for each 24 persons. The jail subscribes to six other publications, and certain Black weekly publications. Five sets of statute books, one for each floor, were on order at time of trial. Mr. Bass also testified about plans for renovation of the facilities. These plans are in many respects contingent upon federal funding and do not directly bear upon the issues in this lawsuit.

d) Inadequate Medical Care

During this time, there was no preliminary examination made before putting the inmates into the general jail population and full physical examinations were not administered at the city jail. Federal prisoners upon admission did not receive VDLR tests, tuberculin *297 tests, chest x-rays, rectal examinations or urinalysis tests. Defendant Jones had no medical assistant at the city jail. There was no registered nurse or dentist on duty during that period. No other doctors, psychiatrist or surgeon was called to the city jail for consultation with respect to the class of federal prisoners, including plaintiff Harold Count Johnson.
There were no facilities at the jail for treating drug addicts. There were no programs for the periodic detection of illness or disease among inmates. If special treatment, including dental work, was required for any inmate, he was sent to the St. Louis City Hospital, a short distance away. There was no written plan for the provision of emergency services within the St. Louis Jail. The warden was in charge of emergency service. Equipment for functional emergencies was, in general, not available at the city jail, but was available for inmate need at the City Hospital.
With respect to prisoner medical and dental records, including records of federal prisoners, the only kind of documents kept at the city jail was a master card in the main office on the first floor showing the name, age, occupation, weight, charge on which confined and nearest relative. There were other cards kept on the second floor of the jail which showed the same information upon which medical notations were kept. The medical information was kept only on the cards retained on the second floor. A log book was also maintained for unusual occurrences or disciplinary actions concerning inmates. The medical cards constituted the complete institutional medical histories and files of the federal inmates at the city jail during the period January 9-May 4, 1971. Medical files were not requested or received at the St. Louis City Jail regarding federal prisoners transferring from federal institutions at that time. Medically, all prisoners at the city jail, including federal prisoners, were treated the same.
Dr. Robert Kars testified that he inspected the infirmary and that it had no general medical texts, that records were inadequate and cleanliness was substandard. The infirmary lacked emergency trays for such situations as cardiac arrest. He was critical of the selection of drugs on hand. The intake examination, often delayed, was not a true physical examination and did not make use of available screening tools. Dr. Gardner testified to the same effect, and expressed his opinion that the absence of medical personnel on duty 24 hours a day was a major deficiency.
In the court's opinion, this compilation of deficiencies, while focusing upon a very real need for corrective action, did not in and of itself represent a violation of a federally protected right.
We next turn to testimony of specific instances of improper treatment. Plaintiff testified that he developed a skin rash shortly after January 9, 1971. He was at first refused any medication by defendant Jones. Finally, after repeated requests, Jones gave him a laxative for the skin rash. Jones later testified that he thought the condition might result from internal conditions, and that a good cleaning out would be helpful. Dr. Sauer testified that he subsequently examined plaintiff, found residual scars and evidence of past skin condition and disputed Dr. Jones' method of treatment.
Henry Cole was a federal prisoner in city jail from January 8, 1971 to March 23, 1971. At the time of his arrival, he had four or five stitches in his chest as a result of a recent knife wound. Cole testified that defendant Jones removed only one of the stitches, and that it was necessary for him to have the remaining stitches removed with the help of other federal prisoners. Dr. Jones testified that at the time he was removing the stitches, Cole protested his method of treatment and refused to permit him to finish the job.
Raymond Charles Milentz was a federal prisoner from November 6, 1970 to April, 1971. He testified that he received *298 no entrance examination, was not given any medicine for swelling due to bug bites and that Dr. Jones refused to treat a rash on his right side, arms and legs. On another occasion, he waited three or four days before receiving treatment at the hospital for a toothache.
Clarence Strunk was a federal prisoner in city jail from May 8 to May 14, 1971. He testified that he brought with him medicine for his peptic ulcer, but was not allowed to keep it. He testified that when he asked to see defendant Jones, Jones told him that he could tell by looking that there was nothing wrong with Strunk and refused to give him any medicine. Strunk testified that he lost 24 pounds following Jones' refusal to prescribe a special diet for him.
Reginald Chambers was a federal prisoner in city jail from November 2, 1970 to May 4, 1971. He sought medical care for headaches and insomnia and was given some aspirin and laxatives.
Until recently, the sick list on each tier was in the control of an inmate tier boss, who could control a prisoner's access to the infirmary.
Present medical care. John Bass, then director of welfare, testified with respect to changes in medical conditions since the filing of the action. The city has employed a licensed practical nurse, a registered nurse, and a record clerk, a full-time physician, and medical secretary.
Nurse Mereweather testified that a new procedure book had been placed in effect in March, 1972 to assist paramedical personnel in conducting screening histories and physical inspections, and identifying with particularity the complaints of the inmates. She testified that sick call is now conducted daily except Thursdays and that Dr. Beachwood is on duty 3½-4 hours per day except Thursdays, Saturdays and Sundays. Nurse Mereweather also testified that a social worker on each floor deals directly with the inmates on matters of health and that inmates are no longer required to process sick claims through tier bosses. Dr. Beachwoood's testimony confirmed the changes which have taken place at the city jail with respect to medical treatment.

e) Food

The court heard considerable evidence that food was prepared under substandard sanitary conditions; that meals were placed on tables outside the cells and allowed to cool and that the meals lacked healthful balance. Witness Bass testified that since the filing of the action, the City of St. Louis has engaged three consultants to review conditions; that four model heating units and 96 trays have been purchased to keep food hot while being delivered to the cells; and that five insulated dispensers have been acquired to deliver hot and cold beverages. He further testified that uniforms have been purchased for inmates engaged in food service activities; and that the city health department is evaulating the kitchen on the same basis as public inspections and that food quantities have been increased.

f) Striking of Prisoner by Defendant Lark

Henry Lee Cole testified that when he tried to prevent a guard from tearing up a cashmere coat during a jail cell inspection Warden Lark struck him with a "slap jack", rendering him unconscious. He testified that when he regained consciousness, he was in a segregation cell and remained there for fifteen days. He testified that he received no warning, no notification of charges or hearing, and that he was placed in the cell without any clothing; that he received one tray of food every other day and was not permitted to shower during this time. He further testified that he received no medical attention while in the "hole".
Clarence Strunk testified that he saw defendant Lark strike Cole; that he saw him kicked in the face and struck with a "slap jack"; and that Cole was taken away and not returned for approximately two weeks. Strunk testified that in *299 addition to Lark, some four to six guards were involved in the incident.
Reginald Chambers testified that he was confined in a segregated cell when Cole was brought to the "hole" and that Cole was in a bloody condition but received no medical attention. Chambers testified that he himself spent fifteen days in the "hole"; that he had no bed, no outside window and the light in the cell was never turned off. He also testified that his clothing was limited to his undershorts; that he was not permitted a shower; that he received bread two to three times per day and a cold meal every other day. Chambers testified that on one occasion after demanding permission to see the warden or the marshal, he was struck in the mouth with jail keys.
The physical conditions of solitary confinement as described by the prisoners were virtually undisputed by the defendants, who directed their defense to the humanitarian changes which have been placed in effect since the filing of this action.
With respect to the beating of federal prisoner Cole, defendant Lark testified that the incident did not occur, and that he was not present in the jail on the date it was alleged to have taken place. The facts before the court indicate that, on this issue, the testimony of the federal prisoners is more worthy of belief than that of defendant Lark. The circumstances surrounding the confinement of a federal prisoner in a segregated cell should have been a matter of record readily available to defendant Lark. None of the guards were produced to corroborate his testimony. The court is not called upon to assess the need for physical restraint or the reasonableness of the force used to subdue Cole because defendant Lark has denied the incident. The court finds from the credible evidence that the incident occurred and, absent any mitigating circumstances, constituted an invasion of Cole's constitutional rights by the imposition of cruel and unusual punishment.

g) Alleged Failure to Return Personal Property

Plaintiff contends that he was not properly credited with $10.00 left for him by his mother. Little need be said of this charge. Prior to the filing of the action, errors in accounting were discovered, and plaintiff received a proper credit. The record is completely inadequate to create an inference of financial wrongdoing at the city jail which would afford the basis for injunctive relief. It is true that actions brought to vindicate civil rights do not depend for jurisdiction upon whether such rights are "personal" as opposed to "property" rights. Lynch v. Household Finance Corp., 405 U.S. 538, 92 S.Ct. 1113, 31 L. Ed.2d 424 (1972), reh. denied 406 U.S. 911, 92 S.Ct. 1611, 31 L.Ed.2d 822 (1972). The court simply holds in this case that the evidence fails to establish any damage to plaintiff Johnson on this specification and is insufficient to warrant injunctive relief.

II

Contentions Based on Contract
The City of St. Louis and the United States entered into a contract effective November 7, 1968 for a period of three years whereby the City agreed to provide "safekeeping, care, and subsistence"[8] of federal prisoners in the city jail and the United States agreed to pay the City $3.00 per day per federal prisoner incarcerated in the city jail. One of the "terms and conditions" of the contract was that it was "subject to the provisions of Title 18 of the United States Code and to the rules and regulations governing the care and custody of persons committed hereunder as set forth in Exhibit A  and Exhibit B, hereto attached and made a part hereof." Exhibit A attached to the contract first refers to the provisions of 18 U.S. *300 C. § 4002 under which the Director of the Federal Bureau of Prisons is authorized to contract with the authorities of a state, territory or political subdivision thereof, for the imprisonment, subsistence, care and proper employment of federal prisoners. Exhibit A then sets out 19 regulations governing the custody and treatment of federal prisoners in nonfederal institutions.[9] Johnson's claim under Count II is that the City of St. Louis breached seven of the regulations in Exhibit A of the contract, and that as a third party beneficiary to the contract who was injured as a result of the breach he is entitled to recover $10,500.00 in damages from the City of St. Louis.
The initial question is whether this court has jurisdiction of the claim asserted in Count II. Johnson's jurisdictional allegation in Count II is as follows:
"Original jurisdiction over this suit and this count is conferred upon this court by Title 18 [28] USC Sec. 1331 in that the `matter in controversy exceeds the value of $10,000 . . . and arises under the laws of the United States (namely Title 18 U.S.C. Sec. 4002)."
In Bell v. Hood, 327 U.S. 678, 681-82, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946), the Supreme Court said:
"[W]here the complaint, as here, is so drawn as to seek recovery directly under the Constitution or laws of the United States, the federal court, but for two possible exceptions later noted, must entertain the suit. * * * The reason for this is that the court must assume jurisdiction to decide whether the allegations state a cause of action on which the court can grant relief as well as to determine issues of fact arising in the controversy."[10]
The complaint plainly alleges that the matter in controversy arises under a law of the United States: 18 U.S. C. § 4002. The claim is not immaterial to the statute or insubstantial and frivolous. Therefore, this court concludes that it has federal question jurisdiction under 28 U.S.C. § 1331 to determine whether Count II of the complaint states a claim upon which relief can be granted or to determine the issues of fact arising in the controversy.
The next question is whether Count II states a claim, under 18 U.S.C. § 4002, upon which relief can be granted. Section 4002 provides:
"Federal prisoners in state institutions; employment
"For the purpose of providing suitable quarters for the safekeeping, care, and subsistence of all persons held under authority of any enactment of Congress, the Director of the Bureau of Prisons may contract, for a period not exceeding three years, with the proper authorities of any State, Territory, or political subdivision thereof, for the imprisonment, subsistence, care, and proper employment of such persons.
"Such Federal prisoners shall be employed only in the manufacture of articles for, the production of supplies for, the construction of public works for, and the maintenance and care of the institutions of, the State or political subdivision in which they are imprisoned.
"The rates to be paid for the care and custody of said persons shall take into consideration the character of the quarters furnished, sanitary conditions, and quality of subsistence and may be such as will permit and encourage the proper authorities to provide *301 reasonably decent, sanitary, and healthful quarters and subsistence for such persons."
This section only provides that the Director of the Bureau of Prisons may enter into contracts with State or local authorities to provide, under certain limitations, for the "imprisonment, subsistence, care, and proper employment" of federal prisoners. There is no reference in the section to any civil cause of action for the benefit of anyone allegedly injured by a breach of any contract authorized to be entered into by the section. Plaintiff has cited no authority to show Congress ever contemplated that § 4002 would authorize a private civil action.[11] The provisions of 18 U.S.C. § 4042, which set out the duties of the Bureau of Prisons, have also been held not to create a private civil cause of action. Williams v. United States, 405 F.2d 951, 954 (9th Cir. 1969); Brown v. United States, 342 F.Supp. 987, 992 (E.D.Ark. 1972). Cf. Farkas v. Texas Instrument, Inc., 375 F.2d 629 (5th Cir. 1967), cert. denied, 389 U.S. 977, 88 S.Ct. 480, 19 L. Ed.2d 471. In summary, 18 U.S.C. § 4002 clearly fails to provide a private civil remedy. Therefore, this court concludes that Johnson has failed in Count II to state a claim upon which relief can be granted under 18 U.S.C. § 4002. Count II is dismissed.

III

Legal Conclusions
Approximately 85% of all inmates in the city jail are pre-trial detainees. In this case, plaintiff Johnson was a federal prisoner confined in the city jail awaiting a state court prosecution. The city jail was also used as a place of confinement for federal prisoners awaiting federal prosecution in the area. Federal prisoners were confined there under a contract between the City of St. Louis and the Bureau of Prisons. While the court has chosen, for reasons it considers appropriate under the circumstances, to confine the class to federal prisoners confined in the city jail, what is said and concluded here with respect to civil rights of prisoners would seem to apply with equal force to all prisoners confined within that institution.
"While federal courts have historically been loath to interfere in the operation of state and local prisons, they have long since recognized that a person entering a non-federal confinement institution does not leave all of his constitutional rights behind him, even though those rights are obviously subject to great curtailment in post-conviction confinement and to a lesser extent in pre-trial confinement." Collins v. Schoonfield, Warden, et al., 344 F.Supp. 257, 264 (D. Md.1972). See Jackson v. Bishop, 404 F.2d 571, 576 (8th Cir. 1968).
General living conditions in city jail at the time of the filing of this action, as detailed supra, were unquestionably deplorable. The facility was then, and is now, antiquated and outmoded, and its capacity to house prisoners awaiting trial is inadequate for today's demands. The quality of care and treatment of prisoners within that institution is but a reflection of the physical decay of the institution itself.
At the trial, the court heard testimony of witnesses with respect to desirable standards for confined prisoners as well as legitimate criticisms of existing accommodations and procedures. Nevertheless, a federal court may only invalidate such practices of a state institution if those practices constitute violations of federally guaranteed rights. Collins v. Schoonfield, supra. In evaluating plaintiff's Eighth Amendment *302 claims, we start with the proposition that this Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, 356 U. S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). And, in applying this standard, the courts today will, where appropriate, give consideration to the effect of a "combination of circumstances" in testing whether or not a prisoner has been subjected to cruel and unusual punishment. See Novak v. Beto, 453 F.2d 661, 675 (5th Cir. 1971) (Tuttle, J., concurring in part and dissenting in part). It covers exercises of cruelty by laws other than those which inflicted bodily pain or mutilation. Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910).
The court concludes that during the period January 9, 1971 to May 4, 1971, the general living conditions, as described in this Memorandum and imposed upon federal detainees, most of whom were pre-trial detainees, were collectively so inhumane as to violate their Eighth Amendment rights. The Eighth Amendment is applicable to the states. Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962); Jackson v. Bishop, supra.
In reaching this conclusion, the court is guided by Judge Johnsen's observations in Lee v. Tahash, 352 F.2d 970, 972 (8th Cir. 1965), and cited in Jackson v. Bishop, supra, 404 F.2d at 578:
"`Such treatment is entitled to be held to be within the ban of the Eighth Amendment as representing cruel and unusual punishment and so constituting unlawful administration of prison sentence. It may be observed in this connection that penal admeasurements made by general conscience and sense of fundamental fairness doubtless will not be without some relationship to the humane concepts and reactions of present-day social climate.' Lee v. Tahash, supra, 352 F.2d at 972."
More specifically, the court is affronted by the inhumane practice of confining three men in tiny two-man cells, necessitating that one man sleep upon a floor often damp from plumbing failures, cleaned only once a week with minimal attention to sanitation. The absence of recreational facilities, of any outside exercise areas, the low quality (and temperature) of the food service, not to mention the inadequate ventilation, and the beating of a federal prisoner into unconsciousness should and do shock the general conscience. When a man is taken into official custody, he is unable to protect or fend for himself. Our society demeans itself when it subjects such persons in custody to inhumane conditions and treatment. It can be no answer that the facilities are inadequate, for "inadequate resources can never be an adequate justification for the state's depriving any person of his constitutional rights." Hamilton v. Love, 328 F.Supp. 1182 (E.D.Ark.1971).
Medical Care. The court agrees with the expert witnesses that the medical care provided by defendant Jones and the procedures employed in processing sick call personnel were not of the best. The role of "tier bosses" in screening requests opened up other areas of intimidation and unlawful conduct. Defendant Jones' procedures for intake, examination and treatment left much to be desired, and the availability of skilled assistance in the jail was sharply limited. The test to be applied in this circuit, however, is whether the evidence reveals "obvious neglect or intentional mistreatment." Cates v. Ciccone, 422 F.2d 926, 928 (8th Cir. 1970). Barnes v. Dorsey et al., 480 F.2d 1057 (8th Cir. 1973). The court concludes that plaintiff's credible evidence on this issue  both in terms of general conditions and of his own rash  failed to meet this test. Subsequent to the period in question, substantial improvements in equipment, procedures and personnel were made at the jail. The court concludes the injunctive relief is not now required or warranted as to this aspect of jail *303 life. The same conclusion is reached with respect to the sufficiency of the food service.
Segregation Cells and Solitary Confinement. The mere use of the solitary confinement, or segregation cells described in the evidence, did not in this court's opinion constitute cruel and unusual punishment. Reasonable use of such cells is an established and recognized means of maintaining order in institutions. The space and facilities described do not shock the general conscience.
To the extent, however, that such cells were used as punishment, a clear due process question is presented. Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971); Clutchette v. Procunier, 328 F.Supp. 767 (N.D.Calif.1971). In this case, it is undisputed that federal prisoners were subjected to disciplinary confinement in segregation cells for as long as two weeks without any procedure for, or practice of, informing such prisoner of the alleged rule broken, without giving him an opportunity for hearing before a designated officer, other than the officer making the charge. Such minimal due process procedures are essential. Landman v. Royster, supra; Clutchette v. Procunier, supra; Sinclair v. Henderson, 331 F.Supp. 1123 (E.D.La.1971). During the period in question, federal prisoners were subjected to the punishment of solitary confinement without such minimal due process. Even Dr. Jones had the power effectively to order summary confinement in segregation cells. Further, prisoners were not informed of any rules, other than in the most general terms, infractions of which could result in disciplinary punishment. Today, procedures put into effect by Mr. Bass do seem to satisfy these requirements.
Mail and Access to Courts. Finally, we turn to the mail procedures in effect during the period in question, which required federal prisoners to submit to total examination and censorship of all incoming and outgoing mail. Except in extreme cases, courts may not interfere with reasonable regulations by prison authorities to control incoming and outgoing correspondence. Lee v. Tahash, supra. At the same time, it is equally well settled that access of prisoners to the courts for the purpose of presenting their complaints may not be denied or obstructed. Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); Lee v. Tahash, supra; Sigafus v. Brown, 416 F.2d 105, 107 (7th Cir. 1969); Coleman v. Peyton, 362 F.2d 905, 907 (4th Cir. 1966), cert. denied, 385 U.S. 905, 87 S.Ct. 216, 17 L.Ed.2d 135 (1966). The duty of the court, in reviewing mail regulations, is to balance the asserted need for the regulation in furthering prison security or orderly administration against the claimed constitutional right and the degree to which it has been impaired. Moore v. Ciccone, 459 F.2d 574 (8th Cir. 1972) (en banc).
In this case, the court concludes that such total censorship unreasonably infringed upon the right of federal prisoners in pre-trial status to maintain privileged communications with their attorneys and to complain of their conditions to the courts and others in authority. See Palmigiano v. Travisono, 317 F.Supp. 776, 788 (D.R.I.1970); Carothers v. Follette, 314 F.Supp. 1014, 1024 (S.D.N.Y.1970); Guajardo v. McAdams, 349 F.Supp. 211 (S.D.Tex.1972); Taylor v. Sterrett, 344 F.Supp. 411 (N.D.Tex. 1972).
The court is unable to conclude that access to attorneys during the hours permitted by defendant Lark during the period in question was unconstitutionally limiting. Moreover, the subsequent regulations have substantially enlarged such access.

Conclusion
What effect, then, should the court give to testimony of improvement in jail conditions since the filing of this action? There can be little doubt that the searching discovery conducted on plaintiff's behalf served to awaken those in higher authority to conditions which *304 defendants had to that point countenanced and perpetuated as the order of the day. That day has long passed. The changes effected through the efforts of Bass and with the aid of federal funds have substantially raised minimum standards for all prisoners in the city jail. If effectively enforced, these procedures should assure to federal prisoners reasonable respect for and observance of their federally protected rights.
The court is reluctant in these circumstances to impose sweeping mandates upon defendants, especially in deference to delicate state-federal relationships. The power to do so is there,[12] but should be exercised with restraint, especially where the results to be anticipated have already been substantially achieved, albeit under pressure of litigation.
The court does, however, conclude that injunctive relief should be ordered in the following areas, to prevent any return, after trial, to ingrained and traditional behavior:[13]
1) Defendant Lark and his successor or successors in authority will be enjoined from permitting more than two federal prisoners to be confined in any of the 5' × 8' cells in the jail.
2) Defendant Lark and his successor or successors in authority will be ordered to provide federal prisoners with clean mattress covers, blankets and towels upon admission and to clean, wash or repair such items at reasonable intervals.
3) Defendant Lark and his successor or successors in authority will be ordered to provide soap, water and cleaning equipment for cell maintenance at not less than weekly intervals and whenever required to correct any unsanitary condition in the cells.
4) The invidious practice of using "tier bosses" will be discontinued on all tiers where federal prisoners are housed, and sufficient guard supervision will be maintained to correct promptly any situation which could result in injury to a federal prisoner.
5) Corporal punishment of any federal prisoner is prohibited. No federal prisoner will be placed in a segregation cell without compliance with the following minimum standard:
a. the rule or regulation allegedly violated must have been established in clear terms and reasonable notice of its existence must have been communicated to the federal prisoner population prior to the occurrence of the alleged violation;
b. official written notice of the charge, including the specific rule or regulation violated, reasonable notice of the hearing and notice of the decision following the hearing;
c. a hearing:
(1) conducted by a previously designated administrative tribunal composed only of impartial members who have not participated in the incident alleged to be a violation of the rules or regulations;
(2) at which the accused has the right to present evidence in his defense, through witnesses and otherwise, to cross-examine witnesses;
d. a federal prisoner may be summarily placed in a segregation cell only when his conduct presents a substantial possibility that such person constitutes a threat to himself, to others, or to the safety and security of the jail. He may be so confined only once for any incident and only for a period not to exceed 12 hours before compliance *305 with these requirements for notice and hearing.
e. a federal prisoner in segregated confinement shall have the same access to medical care as other prisoners.
6) Defendant Lark and his successor or successors in office will be enjoined from opening any outgoing mail from federal prisoners addressed to any court, attorney, elected official, any investigative agency of the United States or of any of the several states or of any municipality. Incoming mail identified by return address on envelope as coming from any such court, attorney, elected official or agency may only be opened and inspected in the prisoner's presence for contraband, but shall not be read. The envelope may be discarded, and contraband may be confiscated.
The court believes that, in light of remedial procedures instituted at the city jail since the filing of this action, no additional specifications are required at this time to assure to federal prisoners their First, Eighth and Fourteenth Amendment rights. It is anticipated that these orders can and must be implemented without prejudice to the same Constitutional rights of non-federal prisoners.
Monetary damages to plaintiff are denied. Class damages are inappropriate. No notice having been requested, the court concludes that declaratory and injunctive relief are the only appropriate remedies for this class.
The parties are directed to prepare and submit within 15 days a proposed judgment and decree which will embody the foregoing plan of remedial relief. The court will retain jurisdiction to assure compliance with such judgment and decree.
The foregoing Memorandum Opinion constitutes the court's findings of fact and conclusions of law.
So ordered.
NOTES
[1] A third count, asserting pendent jurisdiction and alleging medical malpractice by defendant Jones, was dismissed by plaintiff prior to trial.
[2] Plaintiff was ably represented prior to and throughout the trial by representatives of the Legal Aid Society of the City and County of St. Louis, who performed their duties in an extremely thorough and highly professional manner.
[3] (The period of time during which plaintiff was a federal prisoner detained in the city jail.)
[4] These conditions also existed at time of trial, with the exception of changes or modifications specifically noted herein.
[5] January  43; February  92; March  75; April  115; May  87. The Government paid the City $3.00 per prisoner per day for the first 9 months of 1971 and $4.45 per day thereafter, the present rate.
[6] Cells are apparently 5' × 8'. The variation is insignificant.
[7] Defense testimony, more fully discusesd infra, reveals substantial modification in these procedures subsequent to the filing of this action.
[8] This included "medical treatment, except the expense of hospital, surgical, and dental treatment, which the Government agrees to bear."
[9] Exhibit B to the contract is not material to the claim.
[10] The "two possible exceptions" are that a suit may sometimes be dismissed for lack of jurisdiction where the claim made under the Constitution or a federal statute "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction" and where the claim is "wholly insubstantial and frivolous". Bell v. Hood, 327 U.S. 678, 682-83, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946).
[11] A prisoner does have remedies in federal court to protect his rights. He can sue the United States for damages for injuries received at the hand of a federal employee under the Federal Tort Claims Act, although defendants herein are not such "employees". See Logue v. United States, 412 U.S. 521, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973). He can sue for injuries received at the hand of a state employee under 42 U.S.C. § 1983 if those actions violated his federal constitutional rights. He could also sue under appropriate state law.
[12] Holt v. Sarver, 442 F.2d 304 (8th Cir. 1971).
[13] Gray v. Sanders, 372 U.S. 368, 376, 83 S. Ct. 801, 9 L.Ed.2d 821 (1963); United States v. W. T. Grant Co., 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).